# UNITED STATES *v.* MORTON SALT CO.

NO. 273.

Argued December 14, 1949.—Decided February 6, 1950.

634

*Philip Elman* argued the cause for the United States. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Bergson, Curtis C. Shears, J. Roger Wollenberg, W. T. Kelley* and *Joseph S. Wright.*

*L. M. McBride* argued the cause and filed a brief for respondent in No. 273.

*Frederic R. Sanborn* argued the cause and filed a brief for respondent in No. 274.

MR. JUSTICE JACKSON delivered the opinion of the Court.

This is a controversy as to the power of the Federal Trade Commission to require corporations to file reports showing how they have complied with a decree of the Court of Appeals enforcing the Commission's cease and desist order, in addition to those reports required by the decree itself.

Proceedings under § 5 of the Federal Trade Commission Act [1] culminated in a Commission order requiring respondents Morton Salt Company and International Salt Company, together with eighteen other salt producers

---

[1] The Federal Trade Commission was established, under the Federal Trade Commission Act, 38 Stat. 717, as amended 52 Stat. 111, 1028, 15 U. S. C. §§ 41 *et seq.*, to prevent unfair methods of competition and unfair or deceptive acts or practices in interstate commerce by certain persons, partnerships or corporations. Under § 5 (b) of that Act the Commission is empowered and directed, following suitable hearing and determination, to order that those found guilty of such practices cease and desist therefrom; and under §§ 5 (c) and 5 (d) exclusive jurisdiction to affirm, enforce, modify, or set aside such orders is placed in the appropriate Court of Appeals, whose judgment and decree are final except insofar as they may be subject to review here. Civil penalties for violations of cease and desist orders are provided for, § 5 (l), to be recovered in civil actions brought by the United States. Under §§ 6 (a) and 6 (b) of the Act, the Commission is authorized to compile information concerning, and to investigate, the organization, business, conduct, practices, and management of any corporation within its jurisdiction, and to require any such corporation to file "annual or special, or both annual and special, reports or answers in writing to specific questions," concerning such information. For the purposes of the Act, the Commission is empowered, in § 9, to examine and copy documentary evidence of any corporation being investigated or proceeded against, and to require attendance of witnesses and production of all such documentary evidence. The same section also gives District Courts jurisdiction to compel compliance with the subpoena as well as other provisions of the Act or any order of the Commission made in pursuance thereof. And, finally, in § 10, it is provided that, "If any corporation required by this Act to file any annual or special report shall fail so to do within the time fixed by the commission for filing the same, and such failure shall continue for thirty days after notice of such default, the corporation shall forfeit to the United States the sum of $100 for each and every day of the continuance of such failure, which forfeiture . . . shall be recoverable in a civil suit in the name of the United States . . . ." The present action was brought to compel the filing of reports ordered by the Commission and for money judgment under § 10 for respondents' default to do so.

and a trade association, to cease and desist from stated practices in connection with the pricing, producing and marketing of salt. The Court of Appeals for the Seventh Circuit affirmed the order with modifications and commanded compliance. 134 F. 2d 354. The decree directed that reports of the manner of compliance be filed with the Commission within ninety days, but it reserved jurisdiction "to enter such further orders herein from time to time as may become necessary effectively to enforce compliance in every respect with this decree and to prevent evasion thereof." The decree expressly was "without prejudice to the right of the United States, as provided in Section 5 (1) of the Federal Trade Commission Act, to prosecute suits to recover civil penalties for violations of the said modified order to cease and desist hereby affirmed, and without prejudice to the right of the Federal Trade Commission to initiate contempt proceedings for violations of this decree." The reports of compliance were subsequently filed and accepted, and there the matter appears to have rested for a little upwards of four years.

On September 2, 1947, the Commission ordered additional and highly particularized reports to show continuing compliance with the decree. This was done without application to the court, was not authorized by any provision of its decree, and is not provided for in § 5 of the statute under which the Commission's original cease and desist order had issued. The new order recited that it was issued on the Commission's own motion pursuant to its published Rule of Practice No. XXVI [2] and the authority granted by subsections (a) and (b) of § 6 of the Trade Commission Act. It ordered these and other parties restrained by the earlier decree to file within thirty days "additional reports showing in detail the

---

[2] See note 4, *infra*.

manner and form in which they have been, and are now, complying with said modified order to cease and desist and said decree." It demanded of each producer a "complete statement" of the "prices, terms, and conditions of sale of salt, together with books or compilations of freight rates used in calculating delivered prices, price lists and price announcements distributed, published or employed in marketing salt from and after January 1, 1944." From the Salt Producers Association it required information as to its activities and services. The Association and some of the producers reported satisfactorily. These two respondents did not. Instead, each informed the Commission in general terms that it had complied with the decree in the manner previously reported, but that it doubted the Commission's jurisdiction to require further reports and declined to supply the particulars demanded. Neither asked any hearing or made objection to the scope of the order.

The Commission next gave respondents notices asserting their default and calling attention to penalties provided in § 10 of the Act. Neither respondent asked any hearing on the notice of default. These suits were then commenced in the name of the United States in District Court under §§ 9 and 10 of the Trade Commission Act, asking mandatory injunctions commanding respondents to report as directed, together with judgment against each for $100 per day while default continued. Respondents answered. Both sides moved for summary judgments. The court found no dispute as to material facts and dismissed the complaints for want of jurisdiction. 80 F. Supp. 419. The Court of Appeals, by divided vote, affirmed. 174 F. 2d 703. We granted certiorari, 338 U. S. 857, because the case involved issues of some importance to enforcement of the Act and of court decrees under it and under other Acts which provide similar methods to enforce orders of administrative bodies.

The Government's suits and the Commission's order are challenged upon a variety of grounds, not all of which were considered by the Court of Appeals. They include contentions that (1) the order constitutes an interference with the decree and an invasion of the powers of the Court of Appeals; (2) the Commission's Rule XXVI is *ultra vires* and violates the Federal Administrative Procedure Act, 60 Stat. 237, 5 U. S. C. §§ 1001 *et seq.;* (3) the procedure is unauthorized by those sections of the Act on which it is based; (4) it is novel and arbitrary and violates the Fourth and Fifth Amendments to the Constitution. For reasons given, we reject each of these contentions.

### I. INVASION OF COURT OF APPEALS JURISDICTION.

The respondents' case and the decision below are rested heavily on this argument that the Commission is invading the province of the judiciary. The Court of Appeals held that the Commission's order of September 2, 1947, represented an unauthorized attempt to enforce that court's decree. It pointed out that the statute had made the court's own jurisdiction of the proceeding "exclusive" and its own decree final. It considered that "every vestige of jurisdiction" over that subject was "firmly and exclusively lodged in [the] Court of Appeals." It noted that it had required filing of only the original compliance reports, and that it had protected its jurisdiction by reserving power to enter further orders necessary to enforce compliance and prevent evasion. It thought that the effect of the Commission's proceedings was to assert "such jurisdiction to reside elsewhere."

It seems conceded, however, that some power or duty, independently of the decree, must still have resided in the Commission.[3] Certainly entry of the court decree did

---

[3] For example, one of the respondents frankly states: ". . . At no time has this respondent attempted to argue that it was immune to investigation by the Federal Trade Commission simply by virtue

not wholly relieve the Commission of responsibility for its enforcement. The decree recognized that. It left to the Commission the right and hence the responsibility "to initiate contempt proceedings for the violation of this decree." This must have contemplated that the Commission could obtain accurate information from time to time on which to base a responsible conclusion that there was or was not cause for such a proceeding. The decree also required the original report showing the manner and form of each respondent's compliance to be filed, not with the court but with the Commission. Presumably the Commission was expected to scrutinize it and, if insufficient on its face, to reject it and move the court to take notice of the default. And the duty likewise was left upon the Commission to move the court if any respondent made a false report. The duty would appear to be the same if a temporary compliance were truly reported but conduct resumed which would violate the decree. In addition, the Trade Commission has a continuing duty to prevent unfair methods of competition and unfair or deceptive acts or practices in commerce. That responsibility as to all within the coverage of the Act is not suspended or exhausted as to any violator whose guilt is once established.

of the original case having come within the jurisdiction of the Court of Appeals. This respondent assumes that in some manner or other the Commission can, if it chooses, continue to police the compliance of this respondent by appropriate investigatory procedures. Whether or not the appropriate procedure is (a) by petitioning the Court of Appeals for permission to investigate the respondent with a view to possible contempt or Section 5 (1) proceedings, (b) by an assertion of a right of investigation under Section 9, even though it be an investigation supplemental to a Court of Appeals decree, or (c) by an assertion of an alleged inherent right of investigation under Section 5, is a matter of law not at issue in this case, and it represents an issue as to which this respondent at the moment is completely indifferent. . . ."

If the Commission had petitioned the court itself to order additional reports of compliance, it could properly have been required to present some evidence of probable violation to overcome the "presumption of legality," of innocence, and of obedience to the law which respondents here urge. Courts hesitate to alter or supplement their decrees except the need be proved as well as asserted. Evidence the Commission did not have; it had at most a suspicion, or let us say a curiosity as to whether respondents' reported reformation in business methods was an abiding one.

Must the decree, after a single report of compliance, rest upon respondents' honor unless evidence of a violation fortuitously comes to the Commission? May not the Commission, in view of its residual duty of enforcement, affirmatively satisfy itself that the decree is being observed? Whether this usurps the courts' own function is, we think, answered by consideration of the fundamental relationship between the courts and administrative bodies.

The Trade Commission Act is one of several in which Congress, to make its policy effective, has relied upon the initiative of administrative officials and the flexibility of the administrative process. Its agencies are provided with staffs to institute proceedings and to follow up decrees and police their obedience. While that process at times is adversary, it also at times is inquisitorial. These agencies are expected to ascertain when and against whom proceedings should be set in motion and to take the lead in following through to effective results. It is expected that this combination of duty and power always will result in earnest and eager action but it is feared that it may sometimes result in harsh and overzealous action.

To protect against mistaken or arbitrary orders, judicial review is provided. Its function is dispassionate and disinterested adjudication, unmixed with any concern as

to the success of either prosecution or defense. Courts are not expected to start wheels moving or to follow up judgments. Courts neither have, nor need, sleuths to dig up evidence, staffs to analyze reports, or personnel to prepare prosecutions for contempts. Indeed, while some situations force the judge to pass on contempt issues which he himself raises, it is to be regretted whenever a court in any sense must become prosecutor. Those occasions should not be needlessly multiplied by denying investigative and prosecutive powers to other lawful agencies.

The court in this case advisedly left it to the Commission to receive the report of compliance and to institute any contempt proceedings. This was in harmony with our system. When the process of adjudication is complete, all judgments are handed over to the litigant or executive officers, such as the sheriff or marshal, to execute. Steps which the litigant or executive department lawfully takes for their enforcement are a vindication rather than a usurpation of the court's power. In the case before us, it is true that the Commission's cease and desist order was merged in the court's decree; but the court neither assumed to itself nor denied to the Commission that agency's duty to inform itself and protect commerce against continued or renewed unlawful practice.

This case illustrates the difference between the judicial function and the function the Commission is attempting to perform. The respondents argue that since the Commission made no charge of violation either of the decree or the statute, it is engaged in a mere "fishing expedition" to see if it can turn up evidence of guilt. We will assume for the argument that this is so. Courts have often disapproved the employment of the judicial process in such an enterprise. Federal judicial power itself extends only to adjudication of cases and controversies and it is natural that its investigative powers should be jealously confined

to these ends. The judicial subpoena power not only is subject to specific constitutional limitations, which also apply to administrative orders, such as those against self-incrimination, unreasonable search and seizure, and due process of law, but also is subject to those limitations inherent in the body that issues them because of the provisions of the Judiciary Article of the Constitution.

We must not disguise the fact that sometimes, especially early in the history of the federal administrative tribunal, the courts were persuaded to engraft judicial limitations upon the administrative process. The courts could not go fishing, and so it followed neither could anyone else. Administrative investigations fell before the colorful and nostalgic slogan "no fishing expeditions." It must not be forgotten that the administrative process and its agencies are relative newcomers in the field of law and that it has taken and will continue to take experience and trial and error to fit this process into our system of judicature. More recent views have been more tolerant of it than those which underlay many older decisions. Compare *Jones* v. *Securities & Exchange Comm'n,* 298 U. S. 1, with *United States* v. *Morgan,* 307 U. S. 183, 191.

The only power that is involved here is the power to get information from those who best can give it and who are most interested in not doing so. Because judicial power is reluctant if not unable to summon evidence until it is shown to be relevant to issues in litigation, it does not follow that an administrative agency charged with seeing that the laws are enforced may not have and exercise powers of original inquiry. It has a power of inquisition, if one chooses to call it that, which is not derived from the judicial function. It is more analogous to the Grand Jury, which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or

even just because it wants assurance that it is not. When investigative and accusatory duties are delegated by statute to an administrative body, it, too, may take steps to inform itself as to whether there is probable violation of the law.

Of course, the Commission cannot intrude upon or usurp the court's function of adjudication. The decree is always what the court makes it; the court's jurisdiction to review is and remains exclusive, its judgment final. What the Commission has done, however, is not to modify but to follow up this decree. It has not asked this report in the name of the court, or in reliance upon judicial powers, but in reliance upon its own law-enforcing powers.

That Congress did not regard it as a judicial function to investigate compliance with court decrees, at least initially, is shown by its action as to other antitrust decrees. Section 6 (c) of the Act under consideration specifically authorizes the Commission, on its own initiative and without leave of court, to investigate compliance with final decrees in cases prosecuted by the Attorney General and not involving the Commission as a party. Congress obviously deemed it a function of the Commission, rather than of the courts, to probe compliance with such decrees, even when it had no part in obtaining them. It surely was not because of fear it would involve collision with the judicial function that Congress omitted express authorization for the Commission to follow up decrees in its own cases. Express grant of power would only seem necessary as to decrees in which the Commission had no other interest.

Whether the Commission has invaded any private right of respondents, we consider under later rubrics. Our only concern under the present heading is whether the Commission's order infringes prerogatives of the court. We hold it does not.

## II. VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT.

The Administrative Procedure Act was framed against a background of rapid expansion of the administrative process as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices. It created safeguards even narrower than the constitutional ones, against arbitrary official encroachment on private rights.

Thus § 3 (a) of the Act requires every agency to which it applies, which includes the Federal Trade Commission, to publish in the Federal Register certain statements of its rules, organization and procedure, "including the nature and requirements of all formal or informal procedures available," and adds that, "No person shall in any manner be required to resort to organization or procedure not so published." In addition § 6 (b) proscribes any requirement of a report or other investigative demand "in any manner or for any purpose except as authorized by law."

Principally on the basis of these two sections respondents contend that the current order cannot be enforced except in violation of the Administrative Procedure Act. Have the respondents been ordered to comply with procedure of which they were not put on notice by publication in the Federal Register? And to the extent that the procedure had been defined and published, was it authorized by law?

The pertinent provisions of the Administrative Procedure Act became effective September 11, 1946. On December 11, 1946, the Federal Trade Commission published in the Federal Register its Rules of Practice, 11 Fed. Reg. 14233–14239. The Commission's Rule XXVI, *id.*, 14237, republished without change in 12 Fed. Reg. 5444, 5448, sets the time limit for filing initial reports of compliance with Commission orders and asserts the Commission's right to require, within its sound discretion, the

filing of further compliance reports thereafter.[4]   In § 7.12 of its Statement of Organization, Procedures, and Functions, 12 Fed. Reg. 5450, 5452, the Commission restated its right to require by order "such supplemental reports of compliance as it considers warranted," and defined the contents of such a report.[5]

---

[4] "§ 2.26  *Reports showing compliance with orders and with stipulations.*   (a) In every case where an order to cease and desist is issued by the Commission for the purpose of preventing violations of law and in every instance where the Commission approves and accepts a stipulation in which a party agrees to cease and desist from the unlawful methods, acts or practices involved, the respondents named in such orders and the parties so stipulating shall file with the Commission, within sixty days of the service of such order and within sixty days of the approval of such stipulation, a report, in writing, setting forth in detail the manner and form in which they have complied with said order or with said stipulation; *Provided, however,* That if within the said sixty (60) day period respondent shall file petition for review in a circuit court of appeals, the time for filing report of compliance will begin to run de novo from the final judicial determination . . . .

"(b) Within its sound discretion, the Commission may require any respondent upon whom such order has been served and any party entering into such stipulation, to file with the Commission, from time to time thereafter, further reports in writing, setting forth in detail the manner and form in which they are complying with said order or with said stipulation. . . ."

[5] "§ 7.12  *Compliance and enforcement.*   (a) Reports of compliance with orders to cease and desist are required in accordance with the provisions of § 2.26 of the rules of practice.   The Commission may by order require such supplemental reports of compliance as it considers warranted.   Reports of compliance must consist of a full statement showing the manner and form in which the order has been complied with.   Mere statements that the respondent is not violating the order are not acceptable.   A factual showing is required sufficient to enable the Commission to appraise the manner and form of compliance.

"(b) After an order to cease and desist issued by the Commission pursuant to the Federal Trade Commission Act has become final as provided for under section 5 of that act, and the Commission has

We conclude that the Commission's published Rule XXVI announced the right it claims in this case to demand of a party against whom an enforcement decree has been entered that it "file with the Commission, from time to time thereafter, further reports in writing, setting forth in detail the manner and form in which they are complying with said order . . . ." Taken together with the Commission's Statement of Organization, Procedures, and Functions, *supra,* if indeed not by itself, Rule XXVI amply met the requirements of § 3 (a) of the Administrative Procedure Act.

Respondents hardly challenge this conclusion. Theirs is the more subtle argument that requirement of supplemental reports following court enforcement of a Commission order is unauthorized by statute and *ultra vires,* so that no valid notice of Rule XXVI had been or could be given, as required by § 3 (a) of the Administrative Procedure Act. Also, it is said to be in direct violation of § 6 (b) of that Act. This leads to the question of statutory authority for the order to report, a question we must determine even apart from consideration of the Administrative Procedure Act. Accordingly we turn to the Federal Trade Commission Act itself to see whether it contains statutory authority for the Commission's Rule XXVI, as well as for its order here sought to be enforced, issued, as it was, pursuant to the procedures proclaimed

---

reason to believe that a respondent has violated such order, it shall certify the facts concerning the violation to the Attorney General, who may institute a suit in one of the District Courts of the United States for the recovery of civil penalties as provided in the act. In proceedings under the Federal Trade Commission Act, where a Circuit Court of Appeals of the United States has by decree commanded obedience to the Commission's order, enforcement may be accomplished by way of contempt proceedings in the Circuit court. With respect to orders under the various provisions of the Clayton Act, enforcement must be accomplished by way of contempt proceedings. . . ."

in that Rule. If we find such statutory authority, we must conclude that the objections under the Administrative Procedure Act are taken in vain.

III. STATUTORY AUTHORITY TO REQUIRE REPORTS.

The Court of Appeals found the Commission to be without statutory authority to require additional reports as to compliance. Section 6 of the Federal Trade Commission Act, it thought, could not be invoked in connection with a decree sought and entered pursuant to § 5, which sections the court regarded as insulated from each other and directed to wholly different situations. Section 6, so it was held, authorized requirement only of "special reports" supplemental to "annual reports" and could not be authority for requiring special reports supplemental to a report of compliance required by court decree in a § 5 case.

At the root of this position lies the elaborate and plausible argument of respondents that §§ 5 and 6 of the Act set up self-sufficient, independent and exclusive procedures for dealing with different matters and that therefore neither section can be supported or aided by the other. Respondents also say that the present use of the asserted power is novel and unprecedented in Commission practice and introduces a new method of investigating compliance. Respondents are not without statements by the Commission or its officials, *dicta* from judicial opinions, views of text writers and facts of legislative history which give some support to this theory. But this Court never before has been called upon to deal consciously and squarely with the subject.

The fact that powers long have been unexercised well may call for close scrutiny as to whether they exist; but if granted, they are not lost by being allowed to lie dormant, any more than nonexistent powers can be prescripted by an unchallenged exercise. We know that unquestioned powers are sometimes unexercised from lack

of funds, motives of expediency, or the competition of more immediately important concerns. We find no basis for holding that any power ever granted to the Trade Commission has been forfeited by nonuser.

The Commission's organic Act, § 5, comprehensively provides substantive and procedural rules for checking unfair methods of competition. The procedure is complete from complaint and service of process through final order, court review, and enforcement proceedings to recover penalties which are not those here sued for. This entire subject of unfair competition, it is true, came into the bill late in its legislative history and dealt with a commercial evil quite different from the target of prior antitrust laws. It is to be noted, however, that although complete otherwise, this section confers no power to investigate this or any other matter. That power, without which all others would be vain, must be found in other sections of the Act. The Commission, for power to investigate compliance with a § 5 order, has turned to § 6, which authorizes it to require certain reports but is not expressly applicable to a § 5 case. Respondents say it might better have turned to § 9, which authorizes it to send investigators to examine their books, copy documents and issue subpoenas, and which is expressly applicable to § 5 proceedings.

Section 6, on which the Commission relies, adds, among other things and with exceptions not material, the power "to investigate from time to time the organization, business, conduct, practices, and management of any corporation engaged in commerce, . . . and its relation to other corporations and to individuals, associations, and partnerships." It also authorizes the Commission "to require, by general or special orders, corporations engaged in commerce . . . to file with the commission in such form as the commission may prescribe annual or special, or both annual and special, reports or answers in writing

to specific questions, furnishing to the commission such information as it may require as to the organization, business, conduct, practices, management, and relation to other corporations, partnerships, and individuals of the respective corporations filing such reports or answers in writing."

To one informed of no fact apart from this text, it would appear to grant ample power to order the reports here in question. Respondents are in the class subject to inquiry, the call is for what appears to be a special report and the matter to be reported would seem to be as to business conduct and practices about which the Commission is authorized to inquire. But respondents advance several arguments to persuade us that this seemingly comprehensive power is subject to limitations not evident in the text.

Respondents derive from legislative history their contention that Congress divided the duties and powers of the Commission into two separate categories, one in § 6 merely re-enacting the old powers of investigation and publicity in antitrust matters—"essentially a mere continuance of the former powers of the old Bureau of Corporations." The other was a new unfair-competition power, self-contained and sealed off in § 5. It is argued that the reports set forth in § 6 can be required only "in support of general economic surveys and not in aid of enforcement proceedings under . . . section 5."

While we find a good deal which would warrant our concluding that § 6 was framed with the pre-existing antitrust laws in mind, and in the expectation that the information procured would be chiefly useful in reports to the President, the Congress, or the Attorney General, we find nothing that would deny its use for any purpose within the duties of the Commission, including a § 5 proceeding. A construction of such an Act that would allow information to be obtained for only a part of a Commission's functions and would require the Commis-

sion to pursue the rest of its duties as if the information did not exist would be unusual, to say the least. The information was such as the Commission was authorized to obtain and we think it could be required for use in determining whether there had been proper compliance with the court's decree in a § 5 case.

It is argued, however, and the court below has agreed, that the "special report" authorized by statute does not embrace the one here asked as to the method of compliance with the decree. We find nothing in the legislative history that would justify so limiting the meaning of special reports, or holding that the report here asked is not such a one. The very House Committee Report (H. R. Rep. No. 533, 63d Cong., 2d Sess.) which the court below thought sustained respondents' contention, we read in its context to support the Commission. Speaking of what became this section, the Report said, "The commission, under this section, may also require such special reports as it may deem advisable. By this means, if the ordinary data furnished by a corporation in its annual reports does not adequately disclose its organization, financial condition, business practices, or relation to other corporations, there can be obtained by a special report such additional information as the commission may deem necessary." *Id.*, at p. 4. An annual report of a corporation is a recurrent and relatively standardized affair. The special report was used to enable the Commission to elicit any information beyond the ordinary data of a routine annual report. If the report asked here is not a special report, we would be hard put to define one.

Nor does the fact that § 5 applies to individuals, partnerships, and corporations, while §§ 6 (b) and 10 apply only to corporations, lead us to conclude that the Act must not be read as an integrated whole. The argument that, because the reporting and penalty provisions of the latter extend only to corporations they must not be invoked to implement, as against corporations, a § 5 pro-

ceeding which contemplates action against persons and partnerships as well, would have force were there not sound reason for more drastic powers to compel disclosure from corporations than from natural persons. What the former may be compelled to disclose without objection the latter may withhold, or reveal only after exacting the price of immunity from prosecution. Corporations not only have no constitutional immunity from self-incrimination, but the disparity between artificial and natural persons is so significant that differing treatment can rarely be urged as an objection to a particular construction of a statute. Moreover, Congress may have considered that the volume or proportion of unincorporated business or the relatively small size of individually owned enterprises, or even a lesser capacity and disposition to resist made it possible to omit persons from duties and penalties imposed on artificial combinations of capital.

We conclude that the authority of the Commission under § 6 to require special reports of corporations includes special reports of the manner in which they are complying with decrees enforcing § 5 cease and desist orders.

IV. RIGHTS UNDER FOURTH AND FIFTH AMENDMENTS.

The Commission's order is criticized upon grounds that the order transgresses the Fourth Amendment's proscription of unreasonable searches and seizures and the Fifth Amendment's due process of law clause.

It is unnecessary here to examine the question of whether a corporation is entitled to the protection of the Fourth Amendment. *Cf. Oklahoma Press Publishing Co.* v. *Walling,* 327 U. S. 186. Although the "right to be let alone—the most comprehensive of rights and the right most valued by civilized men," Brandeis, J., dissenting in *Olmstead* v. *United States,* 277 U. S. 438, 471, at 478, is not confined literally to searches and seiz-

ures as such, but extends as well to the orderly taking under compulsion of process, *Boyd* v. *United States,* 116 U. S. 616, *Hale* v. *Henkel,* 201 U. S. 43, 70, neither incorporated nor unincorporated associations can plead an unqualified right to conduct their affairs in secret. *Hale* v. *Henkel, supra; United States* v. *White,* 322 U. S. 694.

While they may and should have protection from unlawful demands made in the name of public investigation, *cf. Federal Trade Comm'n* v. *American Tobacco Co.,* 264 U. S. 298, corporations can claim no equality with individuals in the enjoyment of a right to privacy. *Cf. United States* v. *White, supra.* They are endowed with public attributes. They have a collective impact upon society, from which they derive the privilege of acting as artificial entities. The Federal Government allows them the privilege of engaging in interstate commerce. Favors from government often carry with them an enhanced measure of regulation. *Cf. Graham* v. *Brotherhood of Locomotive Firemen,* 338 U. S. 232; *Steele* v. *Louisville & Nashville R. Co.,* 323 U. S. 192; *Tunstall* v. *Brotherhood of Locomotive Firemen & Enginemen,* 323 U. S. 210; *Wickard* v. *Filburn,* 317 U. S. 111, at 129. Even if one were to regard the request for information in this case as caused by nothing more than official curiosity, nevertheless law-enforcing agencies have a legitimate right to satisfy themselves that corporate behavior is consistent with the law and the public interest.

Of course a governmental investigation into corporate matters may be of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power. *Federal Trade Comm'n* v. *American Tobacco Co., supra.* But it is sufficient if the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant. "The gist of the protection is in the requirement, expressed in terms, that the disclosure

sought shall not be unreasonable." *Oklahoma Press Publishing Co.* v. *Walling,* 327 U. S. 186, 208. Nothing on the face of the Commission's order transgressed these bounds.

Nor do we consider whether, for reasons peculiar to these cases not apparent on the face of the orders, these limits are transgressed. Such questions are not presented by the procedure followed by respondents. Before the courts will hold an order seeking information reports to be arbitrarily excessive, they may expect the supplicant to have made reasonable efforts before the Commission itself to obtain reasonable conditions. Neither respondent raised objection to the order's sweep, nor asked any modification, clarification or interpretation of it. Both challenged, instead, power to issue it. Their position was that the Commission had no more authority to issue a reasonable order than an unreasonable one. That, too, was the defense to this action in the court below.

Of course, there are limits to what, in the name of reports, the Commission may demand. Just what these limits are we do not attempt to define in the abstract. But it is safe to say that they would stop the Commission considerably short of the extravagant example used by one of the respondents of what it fears if we sustain this order—that the Commission may require reports from automobile companies which include filing automobiles. In this case we doubt that we should read the order as respondents ask to require shipment of extensive files or gifts of expensive books. This is not a necessary reading certainly, and other parties to the decree seem to have been able to satisfy its requirements.

If respondents had objected to the terms of the order, they would have presented or at least offered to present evidence concerning any records required and the cost of their books, matters which now rest on mere assertions in their briefs. The Commission would have had oppor-

tunity to disclaim any inadvertent excesses or to justify their demands in the record. We think these respondents could have obtained any reasonable modifications necessary, but, if not, at least could have made a record that would convince us of the measure of their grievance rather than ask us to assume it.

It is argued that if we sustain this use of § 6, the power will be unconfined and its arbitrary exercise subject to no judicial review or control, unless and until the Government brings suit, as here, for penalties. The Government, it is said, may delay such action while ruinous penalties accumulate and defendant runs the risk that his defenses will not be sustained. However, we are not prepared to say that courts would be powerless if after an effort to clarify or modify such an order it still is considered to be so arbitrary as to be unlawful and the Government pursues a policy of accumulating penalties while avoiding a judicial test by refusing to bring action to recover them. Since we do not think this record presents the question, we do not undertake to determine whether the Declaratory Judgment Act, the Administrative Procedure Act, or general equitable powers of the courts would afford a remedy if there were shown to be a wrong, or what the consequences would be if no chance is given for a test of reasonable objections to such an order. Cf. *Oklahoma Operating Co.* v. *Love,* 252 U. S. 331. It is enough to say that, in upholding this order upon this record, we are not to be understood as holding such orders exempt from judicial examination or as extending a license to exact as reports what would not reasonably be comprehended within that term as used by Congress in the context of this Act.

The judgment accordingly is

*Reversed.*

Mr. Justice Douglas and Mr. Justice Minton took no part in the consideration or decision of these cases.