563 F2d 1008
 UNITED STATES of America and Daniel J. Peterson, Regional
Counsel, Federal Aviation Administration, Rocky
Mountain Region, Appellees,
v
FRONTIER AIRLINES, INC. and A.L. Feldman, President,
Frontier Airlines, Inc., Appellants.
 No. 76-1524.
 United States Court of Appeals, Tenth Circuit.
 Argued Aug. 5, 1977.
Decided Oct. 14, 1977.
 
 Raymond J. Turner, Denver, Colo., of Dawson, Nagel, Sherman & Howard, Denver, Colo. (Barbara J. Kelley, Denver, Colo., with him on the brief), for appellants.
 Barbara L. Herwig, Atty., Appellate Sec., Civ.Div., Dept. of Justice, Washington, D.C. (Rex E. Lee, Asst. Atty.Gen., Washington, D.C., James L. Treece, U.S. Atty., Denver, Colo., Ronald R. Glancz, Atty., Appellate Sec., Civ.Div., Dept. of Justice, John E. Marsh and Pery A. Kupietz, Attys., Federal Aviation Administration Washington, D.C., with her on the brief), for appellees.
 Before SETH, HOLLOWAY and BARRETT, Circuit Judges.
 SETH, Circuit Judge.
 
 
 1
 This action began with an application by the Federal Aviation Agency to enforce a subpoena duces tecum. 49 U.S.C. Secs. 1354 and 1484(c). The subpoena was directed to Frontier Airlines and its president. It sought to require the production of the tapes from a flight data recorder which was used on a Frontier plane on a specified flight. The tapes were sought in connection with an investigation by the FAA of possible violations of Federal Aviation Regulations. There was no accident or other incident which caused a termination of the flight.
 
 
 2
 The trial court enforced the subpoena as sought by the FAA. Frontier has taken this appeal.
 
 
 3
 The record shows that the FAA received a report from a Yellowstone National Park employee that a Frontier plane had flown close to Mount Sheridan. This complaint was made known to Frontier, and it was requested to provide detailed data as to the particular flight. This was so provided. The FAA also requested the tapes from the flight recorder, but Frontier refused to furnish them. The company, as the reason for refusal, stated that the flight recorder data was for accident investigation and not for administrative investigations relating to compliance with general flight regulations.
 
 
 4
 The FAA notified the pilot that it was contemplated that his flying certificate would be suspended for forty-five days. The FAA repeated its request for the recorder tapes, but Frontier refused and the FAA then sought to have the subpoena enforced by the United States District Court. An order of investigation had issued.
 
 
 5
 The challenge to the subpoena is on the ground that the regulation upon which the subpoena is based or sought does not authorize the FAA to use the data for the purpose it intends. It is urged that the regulation contemplates the installation of a flight recorder, and the use of the data it develops, for purposes different from that for which the data is here sought to be used. Frontier thus urges that the regulations permit the data to be used only for accident investigations. The FAA argues that a regulation as to its general authority to investigate controls, and this would permit the data to be used in a nonaccident investigation.
 
 
 6
 It is apparent that there are imposed limitations on the subpoena power of administrative agencies. See Oklahoma Press Publishing Co. v. Walling, 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614. The court must determine whether the agency is acting within its authority, and as to this the agency has the burden to so demonstrate. United States v. Powell, 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112; Securities & Exchange Comm'n v. Brigadoon Scotch Distributing Co., 480 F.2d 1047 (2d Cir.). The second element which must be shown is that the data sought is "reasonably relevant" to the inquiry. United States v. Morton Salt Co., 338 U.S. k632, 70 S.Ct. 357, 94 L.Ed. 401.
 
 
 7
 We have held on several occasions that the agencies here concerned have broad authority. French v. CAB, 378 F.2d 468 (10th Cir.); Doe v. CAB, 356 F.2d 699 (10th Cir.). See also Moton v. Dow, 525 F.2d 1302 (10th Cir.), but nevertheless when challenged, the scope of authority of the agency must be established.
 
 
 8
 The parties do not agree upon the scope of the regulations. It is apparent that the wording of the two regulations concerned, the one specifically on flight recorders, and the one on general authority to investigate, do not specifically and expressly meet the issue. The FAA urges that its authority is derived from the general regulation, not restricted by the specific regulation. The wording of each of the two regulations when taken separately is relative clear, but the relationship of one to the other is not. One is specific on a narrow subject, while the other is in the most general terms.
 
 
 9
 The general inspection regulation is 14 C.F.R. Sec. 121.81(a):
 
 
 10
 "Each certificate holder shall allow the administrator, at any time or place, to make any inspections or tests to determine its compliance with the Federal Aviation Act of 1958, Federal Aviation Regulations, its operating certificate and operations specifications, or its eligibility to continue to hold its certificate."
 
 
 11
 The specific regulation as to fight recorders, 14 C.F.R. Sec. 121.343(a), read in part:
 
 
 12
 "(a) No person may operate a large airplane that is certificated for operations above 25,000 feet altitude or is turbine engine powered, unless it is equipped with one or more approved flight recorders that record data from which the following information may be determined within the ranges, accuracies, and recording intervals specified in Appendix B of this part--..."
 
 
 13
 This regulation continues to prescribe the data which the recorder must be capable of gathering, (1) and (2)(b), and that the recorder be operated continuously while the plane is in motion. Other technical requirements follow. Also of importance is (c), that the data be kept until the airplane has been operated twenty-five hours of section 1221.359(a) time, and that certain erasures may be made. Subparagraph (d) is quoted hereinafter.
 
 
 14
 Thus the regulations are clear as to what each purports to cover, but again, no relationship between them is indicated. Thus with this apparent complete independence on the face of the two, we must look elsewhere for an answer to their interaction if there be any.
 
 
 15
 We should so consider the Basis and Purpose Statement in the regulation as to flight recorders. 14 C.F.R. Sec. 121.343. This should be done both standing alone, and as tested against the notice of intended rule-making to determine its scope and its relationship to the general regulation, 14 C.F.R. Sec. 121.81(a), and to others on the same general subject. See Burlington Northern, Inc. v. ICC, 149 U.S.App.D.C. 176, 462 F.2d 280. The Basis and Purpose Statement was published with the 1957 amendment to section 121.343 on august 9, 1957, at 22 Fed.Reg. 6379. The Statement of Purpose is rather lengthy and is quite specific. It recites that a choice was made as to which aircraft would be required to have flight recorders. The Statement then reads in part (22 Fed.Reg. 6380):
 
 
 16
 "The Board is of the opinion, however, that in the case of large airplanes certified for use in air transportation above 25,000 feet altitude, a flight recorder should be required for accident investigation purposes and for use in analyzing various incidents, such as extreme vertical accelerations due to turbulence which may occur from time to time in flight but which do not result in accidents, in order to take appropriate precautionary or remedial action. Such airplanes will be operating under conditions with respect to which little operational experience directly applicable to civil transportation exists and the recorder intelligence involving these higher altitudes ... will help materially in making a more accurate determination of the cause of accidents of such aircraft."
 
 
 17
 The Board also stated that a recording device of sufficient reliability was available, and that it should be used in large aircraft certified for use above 25,000 feet. Reliability was related to the "objectives" of the device. "Objectives" was defined as:
 
 
 18
 "...[F]or accident investigation purposes and for use in analyzing various incidents, such as extreme vertical accelerations due to turbulence which may occur from time to time in flight but which do not result in accidents, in order to take appropriate precautionary or remedial action."
 
 
 19
 The statement does not say expressly that the data not be used for other than accident investigations nor does it say that it be Only used for accident investigations. The Statement however must be taken to refer expressly and only to accident investigations and turbulence studies.
 
 
 20
 The regulation was amended in 1959 to provide a period of retention of the tapes. This period of time will be further referred to herein. The Statement of Basis and Purpose with the amendment in part read (24 Fed.Reg. 8090):
 
 
 21
 "In promulgating this regulation, the period of time for retention of the recorder tapes was not included in the rule as it was assumed that air-carriers would retain these records for a sufficient length of time for the investigation of accidents and incidents which may have occurred during the time of flight."
 
 
 22
 Notice of proposed rulemaking to amend the regulation again was published on January 22, 1969 (34 Fed.Reg. 941). This notice gave particular attention to the technical capabilities of the recorders, but again as these factors related to accident investigation, and to provide that the data recorded for a period of time before the accident be retained. It was also to consider means to prevent destruction of the tapes in the event of an accident and retrieval under certain difficult conditions. In any event, the notices were directed to the relationship between the data and accident investigation. The regulation was so amended in 1970, and of course a Basis and Purpose Statement was included (35 Fed.Reg.13191). This Statement generally followed the notice provisions and thus related to technical aspects of a new type of recorders, but again as to accidents. Nothing else was mentioned.
 
 
 23
 The retention time was again changed in 1971, and section 121.343 became effective in its present form. The retention provision is now section 121.343(d), and in fact this subsection apparently contains the only statement of what the carrier is required to do with the tapes. Except for the twenty-five hour period in subsection (c) and as to erasures also in (c), there appears to be nothing else in the regulations as to the disposition of tapes on which data has been recorded. Thus this subsection 121.343(d) assumes considerable importance in the interaction of the regulations.
 
 
 24
 No detailed consideration need be made of the course of the rulemaking and the many matters presented. This "legislative history" of the regulation (121.343) is for all practical purposes consistent with the several basis and purpose statements. The only matter that need be mentioned is that in response to a notice of rulemaking issued by the CAB on NOvember 16, 1955 (20 Fed.Reg. 8500), there was filed a statement or position by the carriers concerning the use of recorders for determining compliance with flight procedures. This seems to have been ignored by the CAB as it made no mention of the matter in the published material. However, we attribute no particular significance to this silence.
 
 
 25
 Thus the Notices and the Statements refer to accident investigation only, and from this we must assume that the regulation was to cover the use of the recorders for that purpose only. It is reasonable, if nothing else is expressed, to so limit their use.
 
 
 26
 As pointed out above, section 121.343(d) is the only direct reference to what must be done with the tapes (except the twenty-five hour period and erasures), and it is of very limited scope. It is the culmination of the series of hearings which were directed to consideration of a device which would produce and, more importantly, retain and protect data in the event of an accident. Much attention had necessarily been given to the mechanical aspects of production of the data, while the carriers' duties as to its retention when so produced did not receive as much consideration. The subsection (14 C.F.R. Sec. 121.343(d)) provides:
 
 
 27
 "In the event of an accident or occurrence that requires immediate notification of the National Transportation Safety Board under Part 430 of its regulations and that results in termination of the flight, the certificate holder shall remove the recording media from the airplane and keep the recorded data required by paragraph (a) of this section for at least 60 days and for a longer period upon the request of the Board or the Administrator."
 
 
 28
 These are the only "events" mentioned, and it must be held that this limited the scope of the regulation. If the data was to be used for other than accident prevention, the Board would certainly have provided for retention under other specified circumstances.
 
 
 29
 As indicated above, the use of the flight recorder data for investigations of nonaccident incidents is simply not covered in the regulations. It is an area in which the FAA has not exercised its rulemaking authority. The circumstances are thus very much like those considered in Pike v. CAB, 303 F.2d 353 (8th Cir.), where the matter sought to be regulated was also in a "gap." The court held that the CAB could not close the gap by implication or policy. We agree, and likewise that the void can only be filled by rulemaking under the Administrative Procedure Act. Texaco, Inc. v. FPC, 412 F.2d 740 (3d Cir.), is a notice case, but is somewhat similar in that the FPC there unsuccessfully sought to cover the matter of compound interest by assertions of general policy. Also a rule without notice in Texaco is somewhat like the extension of the rule into an area not covered. The court in Texaco said:
 
 
 30
 "Section 533 was enacted to give the public an opportunity to participate in the rule-making process. It also enables the agency promulgating the rule to educate itself before establishing rules and procedures which have a substantial impact on those regulated. See Pacific Coast European Conference v. United States, 350 F.2d 197, 205 (9th Cir.), cert. den. 382 U.S. 958, 86 S.Ct. 433, 15 L.Ed.2d 362 (1965). These procedures must be followed when an agency is exercising its legislative function in order that its rules have the force of law ....;;
 
 
 31
 Policy cannot change the rules as here urged by the FAA. Lewis-Mota v. Secretary of LAbor, 469 F.@d 478 (2d Cir.). The Supreme Court in NLRB v. Wyman-Gordon Co., 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 stated:
 
 
 32
 "... They may not be avoided by the process of making rules in the course of adjudicatory proceedings. There is no warrant in law for the Board to replace the statutory scheme with a rule-making procedure of its own invention. Apart from the fact that the device fashioned by the Board does not comply with the statutory command, it obviously falls short of the substance of the requirements of the Administrative Procedure Act ...."
 
 
 33
 The general inspection regulations, 14 C.F.R. Sec. 121.81(a), is the basic authority relied upon by the FAA in seeking the subpoena. It is quoted herein above, and indeed it is a general regulation. Its great breadth casts doubt on its validity in many circumstances. It is certainly open to challenge even in situations where there is no other regulation on the particular matter or subject. We must hold that the specific regulation (section 121.343), considered above, must prevail over the assumption of such broad authority.
 
 
 34
 The FAA and the CAB undertook to construct regulations on flight recorders as an important device to become available in accident investigations. Careful consideration was given to the matter. The regulation was issued, and amended several times; it must be taken as the last word on flight recorders and was the extent authority was exercised.
 
 
 35
 The basis structure of the Administrative Procedure act, 5 U.S.C. Sec. 551, need not be considered. Some detailed consideration, however, should be given to the required Basis and Purpose statement as it relates to the issue before us. Thus the FAA was granted broad rulemaking authority and the Congress thereby delegated some considerable segment of its legislative authority. This authority, under the Administrative Procedure Act, must be exercised within stated restrictions which have a very real importance to those who may be subject to the regulations to be adopted. It is obvious that those concerned must know the particular subject and the scope of the intended exercise of authority. Once the process is under way, the limitations of scope must be observed for apparent reasons. The regulations which emerge are those which were so devised within the limitations. This is not greatly different from the legislative process, but in any event, the Administrative Procedure Act has added an additional element which is the Basis and Purpose Statement. This is provided in 5 U.S.C. Sec. 553(c):
 
 
 36
 "After notice required by this section, the agency shall give interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose."
 
 
 37
 This provision thus requires the agency to include in the rule a "concise" statement of why the rule was adopted and what it is intended to accomplish. The statement is a summary of what, in the legislative proces,s would be gleaned from the hearings and the statements of position which make up the legislative history. The Basis and Purpose Statement is a very significant portion of a regulation when an issue arises as to its application and scope. Thus in the matter before us, these Statements are the basic factors in an examination of the interrelation of the two regulations concerned. Also we must construe the regulations, on this point, narrowly under the Statements. The Congress granted broad authority to the FAA, and Congress by the Administrative Procedure Act required that rulemaking be done only in the prescribed manner. See again NLRB v. Wyman-Gordon Co., 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709.
 
 
 38
 The APA, 5 U.S.C. Sec. 553(c), quoted above, is clear on the requirement for a Statement, and the purpose is obvious. The court considered the requirement in Natural Resources Defense Council, Inc. v. SEC, 389 F.Supp. 689 (D.C.). The need for disclosure of the basis for "standards" under EPA (not APA) was described in Portland Cement Ass'n v. Ruckelshaus, 158 U.S.App.D.C. 308, 486 F.@d 375 (D.C.Cir.). The same considerations are present here.
 
 
 39
 We must hold that the FAA has not met its burden to demonstrate that it is acting within its authority in seeking the subpoena for the purposes stated. We suggest that it is appropriate to apply what may be a somewhat stricter standard when the rulemaking constituted the adoption of a mechanical device. The device and its capabilities were explored at the hearing as they related only to a particular purpose. The device was found to be mechanically reliable to achieve these "objectives," but the use of the device to achieve other objectives was not considered. It is essential under these circumstances to limit the use of the device to the purpose considered. Again, the rulemaking authority has not been exercised as to any other use of the device. When exercised the reliability or validity of its use for these other purposes can be explored in accordance with the APA.
 
 
 40
 We have also examined the regulation relating to voice recorders, section 121.-359(e), but there find nothing particularly helpful in a solution of the issue before us.
 
 
 41
 REVERSED.