UNITED STATES of America and John McCarthy, Auditor, U. S. Department of Energy, Petitioners,

v.

Marshall TOBINS, President Weston Petroleum, Inc., Respondent.

Civ. A. No. 80–2064–K.

United States District Court, D. Massachusetts.

April 20, 1981.

---

Carolyn S. Grace, Asst. U. S. Atty., Boston, Mass., for petitioners.

Segal, Moragn & McMahon, Terry Philip Segal, Boston, Mass., DiSalle & Staudinger, Susan A. Goltz, Washington, D. C., for respondent.

1. Citations for transfer of authority to DOE omitted.

Memorandum

KEETON, District Judge.

This is an action to enforce an administrative subpoena issued by the United States Department of Energy ("DOE"), in the course of an audit of a reseller of petroleum products. Petitioners brought this proceeding under section 13 of the Federal Energy Administration Act of 1974, 15 U.S.C. § 772; section 645 of the Department of Energy Organization Act, 42 U.S.C. § 7255; and section 206 of the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note, as incorporated by 15 U.S.C. § 754(a)(1).[1] Jurisdiction is based upon section 13(e)(2) of the Federal Energy Administration Act of 1974, 15 U.S.C. § 772(e)(2); section 502 of the Department of Energy Organization Act, 42 U.S.C. § 7192; and sections 206 and 211 of the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note, as incorporated by 15 U.S.C. § 754(a)(1).[2]

For reasons set forth below, the petition for enforcement is denied. The court's findings and conclusions are set forth in Parts II and III of this opinion.

I.

Petitioners allege that they seek to obtain from respondent information regarding price, cost, purchase, sale, volume and other data to determine compliance with DOE's mandatory petroleum allocation and price regulations, 10 C.F.R. §§ 205, 210, 211, and 212; that respondent refused to provide such records to DOE because of respondent's belief that production is barred by DOE's audit policy, set forth in 43 Fed.Reg. 27777 (June 27, 1978); and that on April 17, 1980, petitioner McCarthy personally served on respondent a subpoena issued in accordance with DOE Regulations, 10 C.F.R. § 205.8, requiring respondent to appear before petitioner at a specified time and place and to bring with him for examination the books, papers, records, and other data described in the subpoena. A Request for Review and Rescission of Subpoena was

2. Citations for transfer of authority to DOE omitted.

timely filed by respondent on April 23, 1980 and was denied by letter dated April 30, 1980.

Upon respondent's refusal to comply with DOE's subpoena, petitioners brought this action. Petitioners pray that the court direct compliance with the subpoena and award costs and such other and further relief as is just and proper. Following the entry of a show cause order, respondent challenged the subpoena on grounds that its issuance exceeds DOE's lawful authority and violates respondent's Fourth Amendment rights. Respondent contends that the audit (and the subpoena issued pursuant to the audit) is unlawful because it was initiated in violation of the agency's published statement of policy.

By Memorandum and Order of January 8, 1981, the court denied petitioners' motion for judgment on the pleadings. Petitioners filed a motion for reconsideration of this order, to which respondent filed a memorandum in opposition. At a hearing on January 29, 1981, following arguments, the parties were afforded an opportunity to present evidence. The only evidence offered was a Stipulation of Undisputed Facts, and both parties rested. The parties were given the opportunity to file further memoranda. No further submissions having been filed, the court proceeds to address the merits of the controversy, including the contentions raised in the petition for reconsideration.

## II.

1. For the periods encompassed by the subpoena, Weston Petroleum, Inc. was subject to the mandatory petroleum allocation and price regulations set forth in 10 C.F.R. §§ 210–212. Stipulation ¶ 1.

2. Respondent is a reseller of petroleum products within the meaning of 10 C.F.R. § 212.31.

3. Petitioners are duly authorized to administer and enforce the provisions of the mandatory petroleum allocation and price regulations. Stipulation ¶ 3.

4. On April 17, 1980, an administrative subpoena duces tecum and ad testificandum was issued by an authorized agent of petitioners and proper service was effected upon respondents. Stipulation ¶ 4.

5. The testimony and materials requested pursuant to the subpoena were reasonably related to respondent's compliance with the mandatory petroleum allocation and price regulations and would be necessary to petitioner in order to determine whether respondent had complied with those regulations. Stipulation ¶ 4.

6. On June 27, 1978, DOE caused the following Statement of Policy to be published in the Federal Register:

It is the policy of the Economic Regulatory Administration (ERA) not to commence any price regulation audits after June 30, 1978, at: (1) Any resellers, reseller-retailers or retailers (as defined in 10 C.F.R. 212.31) of petroleum products other than propane ... except on suspicion of a willful violation of the price regulations, by reason of complaints or other credible indications of significant violations, or if an exception or other special relief from the price regulations has been afforded....

43 Fed.Reg. 27777, 27782 (June 27, 1978).

7. In the "Discussion" preceding the above statement of policy, DOE stated that:

The ERA is aware of the particular difficulties that may be faced by certain small firms in complying with price regulations and of the responsibility to allocate its own resources to those audit areas having the greatest enforcement potential. Therefore, the ERA has, within the past year, redirected its efforts toward larger firms having a potential for greater recoveries of overcharges.

43 Fed.Reg. 27779 (June 27, 1978).

8. DOE's "Discussion" noted that the House Committee on Interstate and Foreign Commerce, in its report on Department of Energy Civilian Programs Authorization Act for Fiscal Year 1979, H.R.Rep. No.95–1166, Part 2, 95th Cong., 2d Sess. 63 (1978), approved DOE's new audit policies, stating: "The Committee is heartened by

the recent efforts ... to use cost/benefit analysis in establishing workload priorities, in order to reduce the audit emphasis on small firms." 43 Fed.Reg. 27779–80 (June 27, 1978).

9. The Federal Register notice accompanying the policy statement also contained the following statement:

> *Reasons for the Policy.* The ERA views this policy as striking a reasonable balance between two competing considerations—the enforcement of price regulations and the granting of certainty to firms as to the extent of their civil liability.
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> This policy relieves all of approximately 21,600 resellers of petroleum products from undergoing new audits after June 30, 1978, except for the reasons [stated in the policy].

43 Fed.Reg. 27780 (June 27, 1978).

10. In a letter dated May 3, 1978, from David J. Bardin, Administrator, DOE Economic Regulatory Administration, to J. Bennett Johnston, Chairman, Subcommittee on Energy Conservation and Regulation, U. S. Senate Committee on Energy and Natural Resources, Bardin stated:

> I am deeply concerned by your Subcommittee staff's proposal that the Committee cut $2 million from the Compliance and Enforcement budget for FY 1979. We fully agree that we should redirect our resources away from small cases to the more significant violations. Indeed, we have started that shift .... In preparing our FY 1979 budget and in planning the distribution of our personnel resources for FY 1979, we contemplated a substantial reduction in the number of audits of small firms. We have devel-

oped a new policy on small cases.... We have already begun the redeployment of our personnel resources to bring them in line with our small firm policy and to provide for a more economical approach to enforcement audits with more emphasis on significant violations.

(Reprinted in part at 43 Fed.Reg. 27780.)

### III.

Section 13(e)(2) of the Federal Energy Administration Act of 1974, 15 U.S.C. § 772(e)(2), provides that:

> Any appropriate United States district court *may*, in case of contumacy or refusal to obey a subpena issued pursuant to this section, issue an order requiring the party to whom such subpena is directed to appear and to give testimony touching on the matter in question, or to produce any matter described in paragraph (1) of this subsection, ....

(Emphasis supplied.)[3] The contentions of the parties present two issues concerning the court's role under this statute: first, whether in a subpoena enforcement proceeding the court has the power to "review" DOE's exercise of its subpoena power at all; and second, whether the court may in its discretion consider DOE's compliance with its audit policy in deciding whether to enforce the subpoena against respondents.

### A.

As a threshold matter, petitioners contend, citing *Federal Trade Commission v. Standard Oil Company of California ("SOCAL")*, —— U.S. ——, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980) that respondents cannot at this stage of the proceedings obtain review of DOE's decision to subpoena respondent's records. This contention is without merit.

---

**3.** None of the other authorizing statutes cited by petitioners— *i. e.*, §§ 206 and 211 of the Economic Stabilization Act, 12 U.S.C. § 1904 note, as incorporated by 15 U.S.C. § 754(a)(1); and §§ 502 and 645 of the Department of Energy Organization Act, 42 U.S.C. §§ 7192 and 7255—establishes a different standard for the court's enforcement of DOE investigative or enforcement-related subpoenas. The last cited statute, 42 U.S.C. § 7255, incorporates by refer-

ence 15 U.S.C. § 49 (of the Federal Trade Commission Act), which has substantially identical language; the other statutes cited respectively authorize the agency "to seek the aid of the district court" to compel compliance with the subpoena," and authorize judicial review of agency action generally. For convenience I shall refer only to 15 U.S.C. § 772(e)(2) as the authorizing statute.

In *SOCAL*, during the pendency of adjudicative administrative proceedings against it, the respondent brought an action against the agency seeking an order declaring the administrative complaint unlawful, alleging that the agency had issued the complaint without the statutorily required "reason to believe" that respondent had violated the law. Applying the requirement, imposed by section 10(c) of the Administrative Procedure Act, 5 U.S.C. § 704, that absent a statutory exception only "final agency action" is subject to judicial review, the Court in *SOCAL* held that the decision to issue the complaint was not immediately reviewable. Rather, the Court held that because the issuance of a "complaint averring reason to believe is a step toward, and will merge in, the [agency's] decision on the merits, . . . review of this preliminary step should abide review of the final order." 101 S.Ct. at 496.

I conclude that the body of statutory and decisional law governing the reviewability of agency decisions, explained most recently in *SOCAL*, is inapplicable to the present case. This action is before the court on DOE's petition to the court, pursuant to 15 U.S.C. § 772, to enforce its subpoena and thereby to compel respondents to provide records and testimony to the agency. Some review of the validity of the subpoena is clearly contemplated by the statute; otherwise the court would function as a mere rubber stamp and referral of agency subpoenas to the court for enforcement would be pointless. *See, e. g., Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186, 217, 66 S.Ct. 494, 510, 90 L.Ed. 614 (1946) (agency's right to information subject to safeguards of judicial supervision and restraint); *United States v. Bell*, 564 F.2d 953, 959 (Em.App.1977) (bifurcation of subpoena power between agency issuance and court enforcement "is an inherent protection against abuse"); *United States v. Security State Bank and Trust*, 473 F.2d 638, 642 (5th Cir. 1973) ("The system of judicial enforcement is designed to provide a meaningful day in court for one resisting an administrative subpoena.").

■ An agency's decision to compel production of evidence through a petition for enforcement of a subpoena differs in a significant respect from an agency's decision to issue a complaint. The latter initiates an ongoing administrative "proceeding" which will become reviewable once a final administrative adjudication or its legal equivalent occurs. Here, no such proceeding has commenced; the investigation may or may not lead the agency to proceed against respondents. Unreviewability of the decision to petition for enforcement of the subpoena could thus deny any practical remedy against an arbitrary agency investigation. Respondents are entitled to a day in court to challenge the enforceability of the subpoena. Whatever may be the scope and limits of the court's discretion under the authorizing statute, and quite apart from doctrines ordinarily applicable to review of agency decisionmaking, under 15 U.S.C. § 772(e)(2) this court has both jurisdiction and responsibility for determining whether the legal and factual prerequisites to enforcement of the subpoena exist in this case. *Cf. United States v. Powell*, 379 U.S. 48, 57–58, 85 S.Ct. 248, 254–55, 13 L.Ed.2d 112 (1964) (witness or taxpayer may challenge IRS summons "on any appropriate ground"); *Reisman v. Caplin*, 375 U.S. 440, 449, 84 S.Ct. 508, 513, 11 L.Ed.2d 459 (1964) (same).

B.

The principal issues in the present case are whether under the various statutes relied upon for enforcement of the subpoena the court has discretion to consider DOE's compliance with its audit policy statement in deciding whether to enforce the subpoena and, if so, what showing the agency must make to entitle it to enforcement. Petitioners argue that the only factual and legal prerequisites the court may consider in a case such as this are (a) that the investigation is conducted pursuant to a legitimate, statutorily authorized purpose; (b) that the information sought is relevant to that purpose; and (c) that the statutorily prescribed administrative procedures have

been followed. Respondents contend, however, that in order to satisfy the "lawful purpose" criterion petitioners must show that the present investigation was undertaken in conformance with DOE's audit policy statement.

### 1.

■ It is well established that at least in the absence of an agency policy statement of the type at issue here, the court's role in the enforcement of administrative subpoenas is "narrow" and "strictly limited." *Federal Trade Commission v. Texaco, Inc.,* 555 F.2d 862, 872 (D.C.Cir.), *cert. denied,* 431 U.S. 974, 97 S.Ct. 2939, 53 L.Ed.2d 1072 (1977). It is commonly stated that an agency petitioning for enforcement of a subpoena under statutes similar to 15 U.S.C. § 772(e)(2)[4] ordinarily has the burden of showing only lawful purpose, relevance, and conformance with statutorily required procedures; no additional showing of "probable cause" is required. *E. g., United States v. Powell,* 379 U.S. 48, 57–58, 85 S.Ct. 248, 254–55, 13 L.Ed.2d 112 (1964); *United States v. Morton Salt Co.,* 338 U.S. 632, 652, 70 S.Ct. 357, 368, 94 L.Ed. 401 (1950); *Oklahoma Press Publishing Co. v. Walling,* 327 U.S. 186, 209, 66 S.Ct. 494, 505, 90 L.Ed.2d 614 (1946); *United States v. Security State Bank,* 473 F.2d 638, 642 (5th Cir. 1973). These elements make out a *prima facie* case for enforcement of an administrative subpoena. *United States v. Bell,* 564 F.2d 953, 959 (Em.App.1977) (involving DOE's predecessor agency, under an identical statute, before the issuance of the 1978 audit policy statement).

In addition, however, the leading cases also contain language recognizing additional constraints upon agency investigation and imply the need for additional judicial

inquiry in appropriate instances. Thus, *Oklahoma Press* stated that the agency "shall not act *arbitrarily* or in excess of [its] statutory authority, but this does not mean that [its] inquiry must be 'limited ... by forecasts of the probable result of the investigation.'" 327 U.S. at 216, 66 S.Ct. at 509 (emphasis added). *See id.* at 217, 66 S.Ct. at 510 (judicial supervision protects against agency demand for relevant information "if in any respect it is unreasonable or overreaches the authority Congress has given"). Similarly, in *Powell* the Court held that "the Government need make no showing of probable cause to suspect fraud *unless* the taxpayer raises a substantial question that judicial enforcement of the administrative summons would be an abuse of the court's process." 379 U.S. at 51, 85 S.Ct. at 251 (emphasis added). The *Powell* court explained that "[s]uch an abuse would take place if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *Id.* at 58, 85 S.Ct. at 255. Once the government has made its preliminary showing in support of the subpoena, the burden of proving such an abuse of process rests on the respondent. *Id.; United States v. Bell, supra,* 564 F.2d at 960.

### 2.

The parties have cited no case, and the court has found none, involving the effect of an agency's published policy statement on the requirements for the enforcement of a subpoena. The authorizing statute and precedents discussed above neither invite nor foreclose consideration of this addition-

---

**4.** Several statutes provide that the district court "may" enforce the agency's subpoena, where the respondent refuses to obey. *Oklahoma Press* and *Morton Salt* involved § 9 of the Federal Trade Commission Act, 15 U.S.C. § 49, the wording of which is substantially identical to 15 U.S.C. § 772(e)(2). Virtually identical provisions appear in the Commodity Exchange Act, 7 U.S.C. § 15, and in the Interstate Commerce Commission statute, 49 U.S.C. § 12(3).

*See United States v. Security State Bank and Trust,* 473 F.2d 638, 639 (5th Cir. 1973). *Powell* arose under 26 U.S.C. § 7604(b), which directs the district court, after "satisfactory proof is made" by the IRS, to order the arrest of a disobedient taxpayer, and grants the court "power to make such order as he shall deem proper ... to enforce obedience to the requirements of the summons ...."

al factor.[5] It is reasonable to infer, however, that an agency's general obligations to avoid arbitrary action and to act in good faith imply some duty of consistency with its public pronouncements in dealing with those subject to its regulation. A court should be reluctant to lend its authority to an agency investigation that appears to run afoul of this duty.

The case of *United States v. Leahey*, 434 F.2d 7 (1st Cir. 1970) dealt with an analogous issue, and stated principles applicable to the instant case. *Leahey* involved the failure of the Internal Revenue Service ("IRS") to follow its own statement of general procedure, previously published in a news release, requiring its agents to warn a taxpayer whenever they were investigating possible tax fraud. Such a warning would not have been required had the IRS not publicly announced the warning procedure. Following her indictment on tax fraud charges, defendant Leahey moved to suppress evidence obtained from her by the IRS agents on the ground that they had obtained it in violation of specified agency procedure. Affirming on due process grounds the district court's exclusion of the evidence, the Court of Appeals held that due process required the I.R.S. to follow its announced procedures. The court relied on the presence of two factors in reaching its holding: (1) a self-imposed "general guideline, deliberately devised, aimed at establishing uniform conduct" by agency officials; and (2) "an equally deliberate public announcement, made in response to inquiries, on which many taxpayers and their advisors could reasonably and expectably rely." 434 F.2d at 11. Elaborating on these two points, the court stated, first, that if the agency were permitted to disregard its announced procedures, "citizens' faith in the even-handed administration of the laws would be eroded;" and second, that:

When an agency "goes public" it does not do so lightly. Its obligations increase just as do those of a private corporation. This must be so since inquiry of personal, subjective knowledge of a person affected by a procedural dereliction is no more practicable than in the securities field. There is no way of assuring that, once the public announcement has been made, some alert taxpayers or their lawyers have not relied on it.

*Id.* at 10–11.

Although *Leahey* is distinguishable from the present case in several respects—including the manner in which the issue is raised and the degree of hardship imposed upon the aggrieved party by the agency's failure to adhere to its announced policy—the principle of accountability underlying *Leahey* is not inherently limited to the precise situation obtaining in that case. A regulatory agency is not free to declare one policy publicly, and in its communications with Congressional committees, and then follow a different practice in its dealings with regulated entities and individuals.

Petitioners contend that the audit policy statement is a mere declaration of DOE's intentions, unenforceable against the agency, as distinguished from a binding rule or regulation. In this regard, Professor Davis has noted, "[a]nalysis of the problem of whether or not non-legislative rules [typically agency "procedures" or "guidelines"] should be binding on agencies leads to the conclusion that the answer must usually depend on the context of the question, because the problem is commonly interrelated with other considerations of justice." 2 K. Davis, Administrative Law Treatise § 7.21, at 102 (2nd ed. 1979). *See, id.* at 102–03 (discussing *Leahey*). *Leahey* did not purport to adopt a rule "that agencies always

---

5. Respondents argue that Congress' choice of the word "may" rather than "shall" in 15 U.S.C. § 772(e)(2) was deliberate, especially in light of the otherwise applicable subpoena enforcement provision, section 6 of the Administrative Procedure Act, 5 U.S.C. § 555(d), which provides that "[o]n contest, the court *shall* sustain the subpoena . . . to the extent that it is

found to be in accordance with law" (emphasis added). Although the "may" enforce language does on its face appear to give the court some measure of equitable discretion in deciding whether and on what basis to grant or deny enforcement, this semantic distinction is a less compelling ground for decision than those discussed in the text.

violate due process when they fail to adhere to their procedures." 434 F.2d at 11. As in *Leahey,* however, the circumstances of this case militate in favor of binding the agency to its announced policy.

The audit policy statement was not merely a gratuitous, precatory declaration. The announcement was a direct response to public and Congressional dissatisfaction with then-existing DOE audit practices. It was issued in the context of a threatened budget reduction for DOE's enforcement program. Although not formally a "rule," the policy statement was published, after notice and the solicitation of public comment, in the Federal Register, prefaced by an explanation of the rationale for the policy. Among the stated reasons for the new audit policy were to "grant certainty to firms," to relieve small petroleum resellers from the burden of DOE audits, and to allocate the agency's enforcement resources on a cost-benefit basis so as to focus on large pricing violations, in accordance with the wishes of Congress. Clearly, this was a deliberate commitment by the agency, made for what it considered good reasons, to constrain its broad investigatory discretion. Both the substantive context in which the policy was promulgated and the procedural formalities attending its publication distinguish the audit policy statement from the type of interpretive rules, guidelines, general policy statements, and instructions to staff sometimes held not to be binding on the issuing agency. *Cf. Sullivan v. United States,* 348 U.S. 170, 173, 75 S.Ct. 182, 184, 99 L.Ed. 210 (1954) (procedural instructions to U. S. Attorneys not published in Federal Register "simply a housekeeping provision" of the Department of Justice); *Caterpillar Tractor Co. v. United States,* 589 F.2d 1040, 1043 (Ct.Cl.1978) (handbook issued as guide to new tax legislation; taxpayer relies on informal IRS publications "at his peril");

*Carpenter v. United States,* 495 F.2d 175, 184 (5th Cir. 1974) (Treasury publication interpreting tax statute); *Modern Plastics Corp. v. McCulloch,* 400 F.2d 14, 19 (6th Cir. 1968) (NLRB statement of procedure published in C.F.R. "simply a guideline for Board personnel").

It is one thing to hold, as often has been done,[6] that an agency may not adversely affect rights by a mere "general statement of policy," as distinguished from substantive or legislative rules that affect individual rights and obligations and have the force of law. It would be quite a different thing to hold that an agency may announce, to the public and to a Congressional committee that has manifested interest in the agency's practices, a policy limiting its initiation of investigations against small businesses, and then be free to disregard that policy with impunity. Indeed, DOE's own interests in public cooperation are not served by such a public assertion of freedom from accountability. The policy announced here was one on which regulated firms like respondent "could reasonably and expectably rely." *Leahey, supra,* 434 F.2d at 11. In this context the agency should be required to honor its public representations.

For the above reasons, I hold that the court may in its discretion consider the agency's compliance with the audit policy statement and may require compliance with the policy as a prerequisite to enforcement of the subpoena.

### 3.

■ Petitioners finally contend that the court is bound to accept the agency's conclusory assertion that it in fact complied with the audit policy in this case—*i. e.,* that DOE officials made the required determination that "credible indications of significant violations" existed, warranting an audit of

---

**6.** *See, e. g., Chrysler Corp. v. Brown,* 441 U.S. 281, 301–02, 99 S.Ct. 1705, 1717–18, 60 L.Ed.2d 208 (1979); *Morton v. Ruiz,* 415 U.S. 199, 232, 235–36, 94 S.Ct. 1055, 1074–75, 39 L.Ed.2d 270 (1974); *Pacific Gas & Electric Co. v. Federal* *Power Commission,* 506 F.2d 33, 38 (D.C.Cir. 1974); *Texaco, Inc. v. Federal Power Commission,* 412 F.2d 740, 744 (3d Cir. 1969); *Aiken v. Obledo,* 442 F.Supp. 628, 653 (E.D.Cal.1977).

respondent's records.[7] Stated another way, their contention is that DOE's own internal determination of compliance is conclusive, and that the court is without jurisdiction to review their determination. That contention, however, runs afoul of the principle, implicit in *Leahey*, that at least in investigative proceedings that look toward adjudication, as distinguished from those looking toward legislation, it is important that an agency, like a court, appear to act justly as well as doing so in fact. The appearance of fairness is not served if an agency is free to withhold its reasons for determining that it is acting consistently with its announced policy and merely to declare that it has so determined. *Cf. Mobil Oil Corp. v. Department of Energy*, 610 F.2d 796, 803 (Em.App. 1979) ("It is axiomatic that a mere recital of good cause does not create good cause."). Such a recital of a private determination, with no accountability to the court or to the public as to what constitutes compliance, is an inadequate basis for enforcement of the agency's subpoena in the circumstances of the present case.[8] Petitioners were given the opportunity to offer evidence of how and why the determination to issue the subpoena was made, but expressly declined to do so.[9] Petitioners elected to rely on their legal contentions, here determined to be untenable. Enforcement of the subpoena is denied.

---

*See generally* 2 K. Davis, Administrative Law Treatise § 7.21 (2nd ed. 1979).

7. Scannell affid. ¶¶ 4–8. This assertion is contested by respondents, who contend they were advised by DOE auditor McCarthy "that there were no complaints against Weston and that the Department had no reason to believe that Weston had committed any violation of its rules and regulations." Staudinger affid. ¶ 3.

8. Determining that the court in its discretion should not grant enforcement of DOE's subpoena, in the absence of a showing that the agency has complied with its policy statement limiting such investigations, is different from determin-

ing that the court should (or has the power to) *order* that the agency comply with the policy statement—a determination I need not make. I hold only that where the agency refuses to show that it has acted consistently with its announced policy, it cannot obtain the aid of the district court in enforcing a subpoena issued in violation of that policy.

9. It is unnecessary to decide, and I express no opinion on, the nature and extent of the showing sufficient to satisfy the agency's burden of demonstrating compliance with the policy statement.