UNITED STATES of America and Department of Energy Audit Director James Louthan, Petitioners,

v.

ARMADA PETROLEUM CORPORATION, Anthony Wright, Respondents.

Civ. A. No. H–81–2023.

United States District Court, S.D. Texas, Houston Division.

Aug. 20, 1982.

44

Jose A. Berlanga, Asst. U.S. Atty., Houston, Tex., for petitioners.

Frank B. Davis, Andrews & Kurth, Houston, Tex., for respondents.

## MEMORANDUM AND ORDER

CARL O. BUE, Jr., District Judge.

This is an action to enforce an administrative subpoena issued by the United States Department of Energy ("DOE"). The subpoena was issued in the course of an audit of respondent Armada Petroleum Corporation ("Armada"), a reseller of petroleum products. Petitioners brought this proceeding pursuant to Section 645 of the Department of Energy Organization Act of 1977, 42 U.S.C. § 7255 (Supp.1981); Section 13(e) of the Federal Energy Administration Act of 1974, 15 U.S.C. § 772(e) (1976); and Section 5(a)(1) of the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. § 754(a)(1) (1976).[1] Jurisdiction is based upon Section 645 of DOEA, 42 U.S.C. § 7255 (Supp.1981); upon 15 U.S.C. § 772(e)(2) (1976); and upon 28 U.S.C. § 1345 (1976).

Petitioners allege that the requested information regarding purchases, sales, exchanges, and other acquisitions and dispositions of crude oil is necessary to determine compliance with DOE rules and regulations providing for the allocation and pricing of crude oil. Respondents challenge the subpoena on various grounds: (1) lack of authority by the DOE to issue the subpoena; (2) improper purpose of issuing the subpoena; and (3) irrelevance of information sought. By order of January 4, 1982, the Court denied respondents' motion for discovery but directed that three essential witnesses would be produced by the government for the hearing. After hearing evidence on January 18, 28 and 29, 1982, the Court took the matter under advisement and afforded the parties an opportunity to file further memoranda.

For reasons set forth below, the Court concludes that the petition for enforcement must be stayed pending the outcome of criminal proceedings which have been instituted against respondents.

## Background

Respondent, Armada, is a reseller of crude oil, and for the period encompassed by the subpoena, Armada was subject to the mandatory petroleum allocation and price regulations promulgated by the DOE.

The DOE was established by Congress in August 1977, and within that agency there exists the Economic Regulatory Administration ("ERA"). This department has the responsibility to determine compliance with the DOE regulations and to institute appropriate enforcement proceedings for those energy companies which have not complied with the Act. The department devises "target lists" of potential corporations to be audited, and the audit directors in the local divisions have authority to open audits of any corporation found on the target list. Commonly, the first step in initiating a civil audit will be a notice sent from the local audit director to the firm indicating that an audit will take place at the corporate place of business. Alternatively, the director has the discretion to issue a subpoena requesting that the company produce the needed records. The audit is then conducted, and if no civil violation is found, the audit is closed. If the audit does reveal a civil violation, further steps are taken to remedy the overcharges.

When the civil auditors discover what they suspect to be a willful violation, the matter is referred to the Office of Special Investigations, a department under the General Counsel of the DOE. In these instances, the ERA may pursue the civil penalties for inadvertent overcharges while the Office of Special Investigations examines concurrently the potential willful violation. There is often a joint effort between the two departments, and many times the civil auditors assist the special investigators in their inquiries.

If after all available information is gathered and the Office of Special Investiga-

---

1. The authority found in the latter two sources was transferred to the Secretary of Energy by Sections 301(a) and 641 of the Department of Energy Organization Act, 41 U.S.C. §§ 7151(a) and 7251 (Supp.1981).

tions makes a decision that there is credible evidence to indicate criminal activity, the matter is referred to the Justice Department for prosecution. This is an agency decision, but it will be made upon the recommendation of the Director of the Special Investigations, presently Jerome Wiener.

Within Congress the Subcommittee on Investigation and Oversight, headed by Congressman John D. Dingell, holds hearings to determine whether the various executive agencies are carrying out their duties pursuant to the respective statutes. Such hearings were held in February through September of 1981 with emphasis on enforcement of the DOE regulations by ERA and the Office of Special Investigations. Congressman Dingell requested documents from the ERA, and, additionally, he and his subcommittee members questioned both administrators from the ERA and the Office of Special Investigations. The Congressman was highly interested in the progress of matters concerning crude oil resellers, but there never was any direction or even suggestion by Congressman Dingell that the ERA issue a subpoena to or open an audit of Armada.

In February 1978, when the Office of Special Investigations was created, there was an on-going inquiry by the DOE as to Armada's potential willful violations. This investigation was referred to the Department of Justice, and in 1979 two criminal indictments were returned which involved Armada.[2] In one indictment, respondent Armada was named as a defendant in an alleged scheme to defraud the United States for actions during the period of August 1974 to June 1976. The substance of the alleged scheme was a conspiracy to falsely sell lower priced domestic "old" crude oil, that produced before 1973, as the higher priced "new" oil, that produced after 1973. In the other indictment which covered the period of August 1975 to December 1977, Armada's president and part owner, James E. Fisher, was named in a similar conspiracy concerning allegedly fraudulent transactions between Uni Oil, Inc., and Armada.

A second investigation was opened by the Office of Special Investigations which examined Armada's activities during 1978. This matter was eventually referred to the Department of Justice sometime in 1980. No indictment has been returned as to these events.

The third and present investigation by the Office of Special Investigations was begun in April 1980, and a draft referral concerning the activities of Armada during 1979 was presented to Jerome Weiner, the director of Special Investigations Division. There was participation in the preparation of this document by officers from both the ERA and Special Investigations Division. After the draft referral was presented to Jerome Weiner, it was the agency's decision that such referral would not be sent to the Department of Justice but that additional work in securing more records was needed.

Accordingly, it appears that a series of criminal charges have been levied against Armada: an indictment covering August 1974 to June 1976; a second indictment covering August 1975 to December 1977; a referral to the Department of Justice covering activities of 1978; and a draft referral covering 1979.

With regard to the subpoena which is the basis of the present action, it was James Louthan, Audit Director for the Houston Crude Reseller Division, who authorized the audit of Armada. Further, it was Louthan who made the decision to issue a subpoena to Armada requiring production of records for the civil audit.

Louthan met in October 1980 with the other audit directors from Tulsa and Dallas and with the regional director, L.K. Jones. They were provided by the national ERA office with a list of the 75 largest crude reselling firms, and Armada was one of the 75. The purpose of the meeting was to devise a work plan for audits to be completed in the year of 1981. It was Louthan's

2. The first indictment was filed on March 7, 1979, in the criminal case numbered CR–H–79–

41. The second, case number CR–H–79–152, was filed on October 10, 1979.

decision to put Armada on the work plan because Armada had not been audited since 1975.

In the fall of 1980 after the work-plan meeting, Louthan made the determination to issue the subpoena to Armada. Neither Congressman Dingell, nor any person representing Congressman Dingell, nor any official from DOE, nor any official within the Department of Justice ever contacted Louthan with directions to begin an audit of Armada or to issue the subpoena. Louthan discussed the subpoena with Roy Errons in the Houston Office of Special Investigations and with Ed Shaddock, Assistant Counsel for the Houston Crude Reseller Office. Louthan knew that there were prior indictments involving Armada, and he followed the DOE's policy of contacting the Office of Special Investigations that office would, in turn, obtain clearance from the Department of Justice before proceeding with new matters. This clearance came in early February 1981, and thereafter Louthan issued the subpoena.

During the same period, on or about February 1, 1981, Gordon Harvey, Assistant Administrator for the ERA, sent a facts message to the various divisions. Such message contained the names of companies which had not yet been audited. It carried some urgency and established the policy that the local divisions must use greater diligence in completing their audits. This message had no bearing on Louthan's decision to issue the subpoena, as that decision had been made by Louthan some months prior. The policy set forth by Harvey stemmed from the decontrol of oil and gas prices in January 1981, and the DOE needed to finish any uncompleted work on violations occurring before that date.

The subpoena which was issued on February 6, 1981, requested documents from the period of February 1976 through January 1981. On February 13, 1981, Armada submitted a Request for Review of Subpoena, and on the same date it filed with the DOE two requests under the Freedom of Information Act as to whether the subpoena should be rescinded. The DOE notified Armada that the requests had been received but did not modify or rescind the subpoena. Thus, the subpoena became effective on February 28, 1981. 10 C.F.R. § 205.8(b)(5) (1981). After Armada failed to produce the subpoenaed records, the DOE filed the present application on August 12, 1981.

### Authority of the DOE

The DOE derives its statutory power for issuing a subpoena from Section 645 of the DOEA which states in part:

For the purpose of carrying out the provisions of this chapter, the Secretary, or his duly authorized agent or agents, shall have the same powers and authorities as the Federal Trade Commission under section 49 of Title 15 with respect to all functions vested in, or transferred or delegated to, the Secretary or such agents by this chapter.

42 U.S.C. § 7255 (Supp.1981). 15 U.S.C. § 49 gives the Federal Trade Commission the power to require by subpoena "all such documentary evidence relating to any matter under investigation." It provides further that the United States district courts have authority to issue orders requiring production of such documentary evidence.[3]

---

**3.** 15 U.S.C. § 49 provides in part:

For the purposes of sections 41 to 46 and 47 to 58 of this title the Commission, or its duly authorized agent or agents shall at all reasonable times have access to, for the purpose of examination, and the right to copy any documentary evidence of any person, partnership, or corporation being investigated or proceeded against; and the Commission shall have power to require by subpoena the attendance and testimony of witnesses and the production of all such documentary evidence relating to any matter under investi-

gation. Any member of the Commission may sign subpoenas, and members and examiners of the Commission may administer oaths and affirmations, examine witnesses, and receive evidence.

. . . . .

Any of the district courts of the United States within the jurisdiction of which such inquiry is carried on may, in case of contumacy or refusal to obey a subpoena issued to any person, partnership, or corporation issue an order requiring such person, partnership, or corporation to appear before the Commis-

48

Additionally, Section 301 of the DOE Act transferred all of the functions and attendant powers of the Federal Energy Administration ("FEA") to the Secretary of Energy.[4] Two statutes, the Emergency Petroleum Allocation Act and the Federal Energy Administration Act, authorized the FEA to obtain data and information by issuance of subpoena. *United States v. Empire Gas Corp.,* 547 F.2d 1147, 1149–50 (Em.App. 1976), *cert. denied,* 430 U.S. 915, 97 S.Ct. 1326, 51 L.Ed.2d 592 (1977). The Emergency Petroleum Allocation Act, which incorporated Section 206 of the Economic Stabilization Act, allowed the FEA to sign and issue subpoena for the attendance and testimony of witnesses and production of documents "for any purpose related to this title." 15 U.S.C. § 754(a)(1) (1976), incorporating 12 U.S.C. § 1904 note.

■ It is well established that the court's role in the enforcement of administrative subpoena is narrow and strictly limited. *Federal Trade Commission v. Texaco, Inc.,* 555 F.2d 862, 872 (D.C.Cir.), *cert. denied,* 431 U.S. 974, 97 S.Ct. 2940, 53 L.Ed.2d 1072 (1977); *United States v. Tobins,* 512 F.Supp. 308, 313 (D.Mass.1981). There are two criteria which govern the court's enforcement power: (1) the investigation or proceeding must be for a proper statutory purpose, that is, the inquiry must be within the authority of the agency, and (2) the documents sought must be relevant to the investigation or the proceeding. *United States v. Morton Salt Co.,* 338 U.S. 632, 652, 70 S.Ct. 357, 368, 94 L.Ed. 401 (1950); *United States v. Bell,* 564 F.2d 953, 959 (Em. App.1977). Once the government has made its preliminary showing in support of the subpoena, the burden of showing that the enforcement of the subpoena would be an abuse of the court's process rests on the respondent. *United States v. Bell, supra,* 564 F.2d at 958.

■ Respondents attack the authority by which the DOE issued the subpoena on two grounds. First, respondents contend that since the Emergency Petroleum Allocation Act has expired, the substantive authority for issuance of the contested subpoena has likewise expired. Respondents submit that this authority has not been continued by 15 U.S.C. § 760g, as the government claims, because that statute deals only with enforcement proceedings. The savings statute relied upon the petitioners state in part:

The authority to promulgate and amend any regulation, or to issue any order under this Chapter shall expire at midnight September 30, 1981, but such expiration shall not affect any action or pending proceedings, administrative, civil or criminal action or proceeding, whether or not pending, based upon any act committed or liability incurred prior to such expiration date.

15 U.S.C. § 760g (1976). The present action is indeed an "enforcement proceeding" in the sense that the Government has enlisted the aid of this Court in order to enforce its subpoena powers granted in the DOE Act. Respondents cite *United States v. California,* 504 F.2d 750 (Em.App.1974), *cert. denied,* 421 U.S. 1015, 95 S.Ct. 2423, 44 L.Ed.2d 684 (1975), which addressed the savings statute in the Economic Stabiliza-

sion, or to produce documentary evidence if so ordered, or to give evidence touching the matter in question; and any failure to obey such order of the court may be punished by such court as a contempt thereof. . . .

**4.** That statute provides:

(a) Except as otherwise provided in this chapter, there are hereby transferred to, and vested in, the Secretary all of the functions vested by law in the Administrator of the Federal Energy Administration or the Federal Energy Administration, the Administrator of the Energy Research and Development Administration or the Energy Research and Development Administration; and the functions vested by law in the officers and components of either such Administration.

(b) Except as provided in subchapter IV of this chapter, there are hereby transferred to, and vested in, the Secretary the function of the Federal Power Commission, or of the members, officers, or components thereof. The Secretary may exercise any power described in section 7172(a)(2) of this title to the extent the Secretary determines such power to be necessary to the exercise of any function within his jurisdiction pursuant to the preceding sentence.

42 U.S.C. § 7151 (Supp.1981).

tion Act. That case held that federal courts lacked jurisdiction after the Act's expiration date to entertain actions arising under the Stabilization Act unless the action was in the nature of a "pending enforcement proceedings" or was based upon a violation of the Act committed prior to the expiration. The above-quoted statute, 15 U.S.C. § 760g, differs in that it allows jurisdiction whether or not the proceeding was pending before the court prior to the expiration date. However, like *United States v. California*, 15 U.S.C. § 760g gives authority to entertain any action or proceeding based upon acts committed prior to the expiration date. Accordingly, the clear language of the statute and the case law construing other saving statutes support this Court's conclusion that the expiration of the Emergency Petroleum Allocation Act on September 30, 1981, does not impair petitioners' authority to subpoena documents pertaining to transactions prior to that date.

Respondents' second argument for lack of authority is that the subpoena power was never properly delegated to James Louthan, the DOE official who caused the subpoena to be served on Armada. Respondents submit that Barton House, the Acting Administrator of the ERA at the time the subpoena was issued, never delegated subpoena authority to any DOE official. This argument is without merit as the authority to issue such a subpoena had already been delegated by House's predecessor, David Bardin. *See* Exhibit B, Petition to Enforce Department of Energy Subpoena. This delegation order became effective on December 22, 1977, and respondents have presented no evidence to show that this order has ever been rescinded, amended or superseded. Hence, the delegation order by Bardin was in effect at the time the subpoena to Armada was issued, and it was not necessary that Bardin's successors re-delegate this authority.

■ As a related issue, respondents argue that two of the DOE officials in the agency's chain of command, James Fenton and L.K. Jones, were both in an acting capacity when they redelegated the subpoena power to their subordinates. Respondents contend that since these two officials were in an acting capacity for more than thirty days, their actions were invalid under the Vacancies Act, 5 U.S.C. § 3348 (1970). *Williams v. Phillips,* 360 F.Supp. 1363 (D.D.C.1973), relied upon by respondents, explained that the Vacancies Act applies to "the head of an Executive or military department or an officer of a bureau of an Executive or military department whose appointment is not vested in the department head." 360 F.Supp. at 1367 n. 6. The two officials, Fenton and Jones, are "officers" within the definition found in *Buckley v. Valeo,* 424 U.S. 1, 126, 96 S.Ct. 612, 685, 46 L.Ed.2d 659 (1976), but their appointment is vested in the department head. 42 U.S.C. § 7231(a) (Supp.1981). Hence, the thirty-day restriction found in the Vacancies Act is inapplicable to Fenton and Jones, and the Court concludes that their delegation orders were valid. Respondents argue that it was not the department head, the Secretary of Energy, but the Assistant Administrator of the ERA who appointed the officials, and that petitioner has failed to show authority of the Assistant Administrator to make such appointments. The Secretary of Energy by Delegation Order No. 0204-4, 10 C.F.R. § 1001.1 (1981), transferred to the Administrator of ERA the authority to take such action as was necessary and appropriate to administer the functions of the ERA. Thereafter, the Administrator issued a like delegation order to the Assistant Administrator. *See* Exhibit B, Petition to Enforce Department of Energy Subpoena. Through these valid delegation orders, the Assistant Administrator of ERA obtained the necessary authority by which to appoint officials to carry out the functions of the department.

In summary, the Court concludes that there was the requisite statutory authority for the subject subpoena, not only with respect to the statutes and the substantive authority, but also with respect to the officials involved in the redelegation of the subpoena power.

### Relevance

■ Respondents contend that the subpoenaed documents are not necessary to determine Armada's compliance with the DOE regulations since Armada ' has filed with the DOE the required Form ERA–69, Crude Oil Reseller's Self-Reporting Form. Respondents argue that DOE needs no other information than that already provided. The test is whether the material sought is reasonably relevant to the purposes of the investigation. *United States v. Morton Salt Co.,* 338 U.S. 632, 652, 70 S.Ct. 357, 368, 94 L.Ed. 401 (1950). Further, the Temporary Emergency Court of Appeals has held that with regard to DOE subpoena, this standard does not require a showing of specific need for information. *United States v. First City Nat'l Bank of El Paso,* 598 F.2d 594, 599 (Em.App.1979). The agency's subpoena requests are to be measured against the general purposes of its investigation. *F.T.C. v. Texaco, Inc.,* 555 F.2d 862, 874 (D.C.Cir.), *cert. denied,* 431 U.S. 974, 97 S.Ct. 2940, 53 L.Ed.2d 1072 (1977). The subpoena in question calls for all documents relating to Armada's purchases, sales, exchanges, and other acquisitions and dispositions of crude oil during a specified period. These documents are certainly relevant to the DOE's responsibility in determining compliance by Armada as to price and allocation regulations, and this Court is not free to speculate whether information in addition to that found in the Forms ERA–69 would aid the DOE's investigation.

Respondents contend further that the requested documents are not relevant because one of the asserted purposes of the subpoena is to determine whether Armada violated the Administrative Procedures and Sanctions (10 C.F.R. Part 205). As Part 205 is entirely procedural, respondents argue, it is impossible for a company to violate such regulations. . Upon a cursory reading of Part 205, it is clear that some of the procedures are to be followed in a particular manner by private entities, not just the agency. It is possible that respondents may have violated the established procedures,

and, hence, this argument is groundless. Accordingly, the Court concludes that petitioner has carried its preliminary burden of showing statutory authority and that the documents sought are relevant to the matter at hand.

### Improper Purpose

■ Once the government has made out a *prima facie* case for enforcement of an administrative subpoena, the burden is upon the respondents to prove that judicial enforcement of the administrative subpoena would be an abuse of the court's process. *United States v. Bell, supra,* 564 F.2d at 958; *United States v. Tobins, supra,* 512 F.Supp. at 313. Such an abuse would take place if the subpoena had been issued for an improper purpose. *United States v. Powell,* 379 U.S. 48, 58, 85 S.Ct. 248, 255, 13 L.Ed.2d 112 (1964).

Respondents have challenged the purpose for which the subpoena was issued on five separate grounds. In the first, respondents submit that the purpose was improper because of congressional influence exerted upon the agency official making the decision to issue the subpoena.

Courts have recognized the importance of Congressional committees on oversight and investigation, and they are sensitive to Congress's interest in the objective and efficient operation of regulatory agencies. *Gulf Oil Corp. v. F.P.C.,* 563 F.2d 588, 610 (3rd Cir.1977), *cert. denied,* 434 U.S. 1062, 98 S.Ct. 1235, 55 L.Ed.2d 762 (1978). However, under the principle established by *Pillsbury v. F.T.C.,* 354 F.2d 952 (5th Cir. 1966), courts must not tolerate legislative interference with an administrative agency's decision-making process. That case ruled that Congressmen may not

> subject an administrator to a searching examination as to how and why he reached his decision in a case still pending before him, and to criticize him for reaching the "wrong" decision, . . .

354 F.2d at 964. The *Pillsbury* doctrine has been followed in other circuits,[5] and the

---

5. *Gulf Oil Corp. v. F.P.C.,* 563 F.2d 588 (3rd Cir.1977), *cert. denied,* 434 U.S. 1062, 98 S.Ct.

underlying rationale, especially in the agencies' quasi-judicial decisions, is the right of private litigants to a fair trial and the right to the appearance of impartiality by the decision maker. *Koniag, Inc. v. Keppe,* 405 F.Supp. 1360, 1372 (D.D.C.1975), *aff'd in relevant part,* 580 F.2d 601 (D.C.Cir.), *cert. denied,* 439 U.S. 1052, 99 S.Ct. 733, 58 L.Ed.2d 713 (1978). Moreover, the doctrine operates to prevent an agency from ordering an investigation because of political pressure to do so. *S.E.C. v. Wheeling-Pittsburgh Steel Corp.,* 648 F.2d 118, 130 (3rd Cir.1981). However, where the Congressional involvement is directed not at the agency's decision on the merits but at accelerating the disposition and enforcement of the pertinent regulations, it has been held that such legislative conduct does not affect the fairness of the agency's proceedings and does not warrant setting aside its order. *Gulf Oil Corp. v. FPC, supra,* at 611.

■ After examining both the transcripts of the Congressional hearings and the testimony given in this proceeding, the Court is of the opinion that there has been no overreaching by Congressman Dingell's subcommittee. As in *Gulf Oil Corporation,* it appears that the Congressman's interest was not directed to the merits of the proposed audit, that is, whether particular crude oil resellers were in fact in violation of the regulations, but at accelerating the audits which were to take place and at the agency's enforcement of the DOE regulations. Furthermore, the hearings called to the Court's attention took place from February through September 1981, long after the decision by the local official had been made to issue the subpoena. Accordingly, the Court rejects respondents' first contention of Congressional interference.

■ Respondents argue next that the subpoena was issued for an improper purpose because it was issued contrary to the DOE enforcement manual. The local audit director did not follow the usual procedure of sending a letter to the targeted firm, describing the nature of the audit and the records requested for the audit, but instead elected to subpoena the documents. Respondents rely on *United States v. Tobins, supra,* for the proposition that this constituted improper purpose. The ruling in the *Tobins* case as to DOE's audit policy has been expressly disapproved by the Temporary Emergency Court of Appeals. In *United States v. Fitch Oil Co.,* 676 F.2d 673 (Em.App.1982), the appellate court found that the DOE audit policy is not a legislative rule but is intended to govern internal agency procedures. Thus, it is not binding on DOE. *Id.* at 677. *Accord, Modern Plastics Corp. v. McCulloch,* 400 F.2d 14, 19 (6th Cir.1968). Similarly, since the policy was not published in the Federal Register,[6] it cannot be given the status or authority of a regulation. *United States v. Morton Salt Co., supra,* 338 U.S. at 644–45, 70 S.Ct. at 364–65. The Enforcement Manual at issue contained policies and procedures to be followed by DOE personnel in carrying out their responsibilities. Moreover, the manual allowed the audit director discretion as to what procedure he would take. It was intended for use by DOE personnel only, and there was an explicit instruction by Gordon Harvey, Assistant Administrator of ERA, that the manual should not be released outside DOE. *See* Exhibit 2, Memorandum of Authorities in Opposition to Motion for Discovery, December 21, 1981. There was no public reliance as in *Tobins,* and, further, as the manual was an internal document and not an official regulation, it was not bind-

1235, 55 L.Ed.2d 762 (1978); *D.C. Federation of Civic Asso. v. Volpe,* 459 F.2d 1231 (D.C.Cir. 1971), *cert. denied,* 405 U.S. 1030, 92 S.Ct. 1290, 31 L.Ed.2d 489 (1972); *Koniag, Inc. v. Kleppe,* 405 F.Supp. 1360 (D.D.C.1975), *aff'd in relevant part,* 580 F.2d 601 (D.C.Cir.), *cert. denied,* 439 U.S. 1052, 99 S.Ct. 733, 58 L.Ed.2d 713 (1978).

**6.** Respondents quote from *Phillips Pet. Co. v. D.O.E.,* 449 F.Supp. 760 (D.Del.), *aff'd,* 596 F.2d 1029 (Em.App.1978), "The fact that most of the statements at issue in the instant case were not published in the Federal Register is immaterial." *Id.* at 785, n. 102. However, this quotation is entirely inapplicable as the *Phillips* Court was dealing with the rule of deference accorded to an agency's interpretations of its own regulations.

ing upon the parties. Hence, the Court determines that respondents' second contention of improper purpose must fail.

 A third attack to show improper purpose is respondents' allegation that the DOE has not acted in good faith. Numerous examples are set forth by respondents which include generally the DOE's refusal to answer respondents' request for information and for review, alleged releases of confidential information by the DOE to journalists, and the issuance of a subpoena by the Office of Special Investigations to one of Armada's banking institutions. "Bad faith" connotes a conscious decision by an agency to pursue a groundless allegation without hope of proving that allegation. *S.E.C. v. Wheeling-Pittsburgh Steel Corp., supra,* 648 F.2d at 125, n. 9. No such decision by the DOE is apparent. Indeed, testimony given at the hearing indicates that the DOE had gained information from several sources other than respondents to cause the agency to believe that there may be possible violations. As to the DOE's refusal to respond to Armada's request for review, inaction is an appropriate response under the regulations, and such inaction causes the subpoena to become effective as issued. 10 C.F.R. 208(b)(5) (1981). Further, Jones gave his opinion in his deposition that he, as an auditor, was not qualified to answer the legal questions raised by Armada in its request for review. He felt those should be left to the court. *See* Respondents' Memorandum of Authorities in Opposition to Petition to Enforce DOE Subpoena at 5, January 4, 1982. There is no evidence to support any conclusion that the DOE as an agency made confidential information available to journalists. Such contention is without foundation. Finally, the subpoena issued to Armada's bank is clearly permissible as Section 645 of the DOE Act authorizes the agency to subpoena documentary evidence from parties not the subject of an investigation or proceeding. *United States v. First City Nat'l Bank of El Paso,* 598 F.2d

594, 599 (Em.App.1979). Accordingly, respondents' allegation of bad faith is meritless and must be disregarded.

Respondents submit that the subpoena was issued for an improper purpose because the subpoena referred to a "matter" and not an investigation or an audit. Respondents claim that such is not provided for in the DOE regulations. As established previously in this Order, Section 645 of the DOE Act incorporates Section 9 of the Federal Trade Commission Act. Section 9 gives the agency the authority to require by subpoena all such documentary evidence relating to *any matter* under investigation. 15 U.S.C. § 49 (Supp.1982) (emphasis added). The language used in the subpoena comes within the ambit of this statute, and, accordingly, respondents' argument is rejected.

 The last of respondents' allegations of improper purpose gives the Court reason for concern. It is respondents' position that the subpoena was issued for the purpose of obtaining evidence to support criminal charges pending against Armada and its chairman, J.E. Fisher.[7] Much of the case law in this area involves enforcement of IRS summonses. *See Reisman v. Caplin,* 375 U.S. 440, 84 S.Ct. 508, 11 L.Ed.2d 459 (1964) (The recipient of an IRS summons may not bring suit for injunctive relief, but he may challenge the summons at the enforcement proceeding on any appropriate ground.) *United States v. Powell,* 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964) (After the IRS makes its required showing, this can be attacked by the recipient upon proof of abuse of process.) *United States v. LaSalle Nat'l Bank,* 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978) (The district court can enforce an IRS summons only if it is issued in good faith and prior to official referral for criminal prosecution.) It is generally agreed that the principles of these cases apply to other administrative subpoe-

**7.** Petitioners' Exhibits 1 and 2 are copies of the indictments to which respondents refer. *See* Note 2, *supra.*

na as well.[8] However, the Fifth Circuit has suggested that IRS cases may not apply to every aspect of the law regarding other agencies' administrative subpoena and that the application will turn on statutory differences. *S.E.C. v. ESM Government Securities, Inc.,* 645 F.2d 310, 313 n. 3 (5th Cir. 1981).[9] The rule espoused in *LaSalle* is based on statutory limitations unique to the IRS, 26 U.S.C. § 7602 (1970). This distinction has been aptly explained in *S.E.C. v. Dresser Industries, Inc.,* 628 F.2d 1368, 1377–84 (D.C.Cir.), *cert. denied,* 449 U.S. 993, 101 S.Ct. 529, 66 L.Ed.2d 289 (1980). 26 U.S.C. § 7602 has bestowed upon the IRS the authority to summon production for four purposes only, and these do not include the goal of filing criminal charges against citizens. *United States v. LaSalle, supra,* 437 U.S. at 316, 98 S.Ct. at 2367. Conversely, the *Dresser* Court found that the investigative provisions of the securities laws are far broader than Section 7602 of the Internal Revenue Code. 628 F.2d at 1379. Similarly, in comparing the pertinent DOE statutes authorizing subpoena, this Court concludes, like the *Dresser* Court, that DOE investigations are not confined to "four purposes only". Rather, a broad statutory mandate allows the DOE to require by subpoena "all such documentary evidence relating to *any matter* under investigation." 42 U.S.C. § 7255 (Supp.1981) (which incorporates such language from 15 U.S.C. § 49). Additionally, the FEA, whose authority was transferred to the Secretary of Energy, was able to issue subpoena "for any purpose related to this title." 15 U.S.C. § 754(a)(1) (1976) (incorporating Section 206 of the Economic Stabilization Act.) Consequently, the Court is inclined to follow the lead of the *Dresser* case with respect to parallel investigations of civil and criminal claims.

**8.** *S.E.C. v. Wheeling-Pittsburgh Steel Corp.,* 648 F.2d 118 (3rd Cir.1981); *Atlantic Richfield Co. v. F.T.C.,* 546 F.2d 646 (5th Cir.1977); *N.L. R.B. v. Interstate Dress Carriers, Inc.,* 610 F.2d 99 (3rd Cir.1979).

**9.** The Fifth Circuit in footnote 3 listed various SEC cases which followed IRS rulings and oth-

The *Dresser* case held that absent special circumstances a parallel investigation conducted by a grand jury under the guidance of the Justice Department did not preclude the SEC from being entitled to enforcement of its subpoena issued in connection with a civil investigation. *SEC v. Dresser Industries, supra,* 628 F.2d at 1377. However, that court proposed circumstances in which there would be reason for restriction:

Other than where there is specific evidence of agency bad faith or malicious governmental tactics, the strongest case for deferring civil proceedings until after completion of criminal proceedings is where a party under indictment for a serious offense is required to defend a civil or administrative action involving the same matter. The noncriminal proceeding, if not deferred, might undermine the party's Fifth Amendment privilege against self-incrimination, expand rights of criminal discovery beyond the limits of Federal Rule of Criminal Procedure 16(b), expose the basis of the defense to the prosecution in advance of criminal trial, or otherwise prejudice the case. If delay of the noncriminal proceeding would not seriously injure the public interest, a court may be justified in deferring it.

*Id.* at 1375–76. In *Dresser* no indictment had been returned. In the present matter there have been two indictments returned which involve respondents. These allege a fraudulent conspiracy relating to the purchase and sale of crude oil, and together the two indictments cover the period of August 1974 through December 1977. As the subpoena in question covers the period of February 1976 through January 1981, there is a substantial overlap in the time during which both criminal and civil proceedings involve respondents' activities in reselling crude oil. Accordingly, this Court concludes that the proper course to follow is to defer

er SEC cases which did not follow IRS precedent. The only other case cited was an FTC case based on the rule in *Reisman v. Caplin, supra. Reisman,* an IRS case, held that pre-enforcement injunctive relief for the summons recipient is inappropriate.

ruling on the present petition to enforce the DOE subpoena until completion of the criminal proceedings. Additionally, the Court determines that delay of the noncriminal proceeding would not seriously injure the public interest, as the pertinent DOE price and allocation regulations are no longer viable due to the President's order of decontrol. Thus, there are no on-going violations. It may be that the trials of the criminal cases will reduce the scope of the present proceeding, or at the very least simplify the issues. In taking the approach of deferral, the Court can ensure that respondents' Fifth Amendment privileges will not be threatened and that no prejudice will come to them because of the civil action. Hence, it is ordered that this civil action to enforce the Department of Energy subpoena is hereby stayed in all respects until after the completion of the criminal proceedings pursuant to the two above-mentioned indictments.

### Discovery

As a final matter for the Court's consideration, respondents have reurged their motion for discovery. The Fifth Circuit in *United States v. Harris,* 628 F.2d 875, 883 (5th Cir.1980), expressly sanctioned the procedure taken by the First Circuit. It stated that the general solution is for

> the district court to proceed directly to a hearing at which, if desired, the summonee could examine the agent who issued the summons, concerning his purpose. The court could then, by observation and, where necessary, its own questioning of the agent, make its own determination of whether exploration, as by discovery, seemed to be in order.

*Id.* at 881. The Court required by order of January 4, 1982, that the DOE produce three particular witnesses at the hearing in order to allow respondents to develop their position and to extract the information needed to demonstrate the facts. These persons were extremely knowledgeable as they occupied key positions in the DOE: the Assistant Administrator of the ERA, the head of the Office of Special Investigations, and the local official who made the decision to issue the subpoena. The Court heard two full days of testimony. Moreover, respondents have filed as exhibits copies of transcripts of the Congressional hearings which are the primary source of information for respondents' argument of Congressional interference. The Court has studied all of this material, the many memoranda which the parties have filed, and the applicable statutes and case law, and the Court is of the opinion that this is sufficient for a just determination of the matter. Accordingly, respondents' motion for discovery is denied.